**Darleen E. PALLETT, Plaintiff,**

v.

**Michael PALMA and Iona College, Defendants.**

**Christine KRACUNAS, Plaintiff,**

v.

**Michael PALMA and Iona College, Defendants.**

**No. 95 Civ. 0315.**

United States District Court, S.D. New York.

Jan. 19, 1996.

Lovett & Gould by Jonathan Lovett, White Plains, NY, for plaintiff.

Elise M. Bloom, Jackson Lewis Schnitzler, New York City, George Hodges, Boeggeman, George, Hodges, White Plains, NY, Stephen Holden, Holden Brothers, PC, White Plains, NY, for defendants.

### MEMORANDUM & ORDER

BRIEANT, District Judge.

By motions fully submitted on December 8, 1995, defendant Iona College moved for partial summary judgment as to the Title IX claim of plaintiff Darleen E. Pallett in these consolidated actions, and for summary judgment as to all of the claims of plaintiff Christine Kracunas.

In opposing the motions, plaintiff Kracunas moved for leave to serve a second amended complaint. That pleading is deemed to have been allowed and served, and the motion is treated as directed against that complaint.

*Parties*

Plaintiff Darleen E. Pallett filed her lawsuit on January 17, 1995. She was, at relevant times, an undergraduate student at Iona College. Plaintiff Christine Kracunas filed her lawsuit on March 9, 1995, and first amended her complaint on March 14, 1995. She was a graduate student at Iona College, studying toward a degree in English, and was at the same time employed in an administrative capacity at the College as Acting Director for Public Relations.

Defendant Michael Palma, referred to as Professor Palma, is a tenured full time faculty member in the English Department of the School of Arts and Sciences of Iona College.[1] Iona College, a prestigious non-profit institution of higher learning founded in Westchester County some 55 years ago, regularly accepts and permits its students to accept the various federal loans and handouts which make applicable to this case the provisions of 20 U.S.C. § 1681 *et seq.*, commonly referred to as Title IX and sustain subject matter jurisdiction in this Court. Both plaintiffs are suing under Title IX and Ms. Kracunas has also sued under Title VII, 42 U.S.C. § 2000e et seq. Supplemental claims have been pleaded under New York law.

*Pleadings*

The complaint of Ms. Pallett alleges that on or about May 19, 1994, she was falsely imprisoned and sexually harassed in the office of Professor Palma at an on-campus facility known as English House.

Ms. Pallett alleges in lurid detail beginning at ¶ 10 of the complaint a conversation with Professor Palma beginning at 1:00 P.M. and lasting between two and two and one half hours. According to her version of the discussion, she had attended at the office of Professor Palma to protest a failing grade on a paper and seek to have her grade raised. During that lengthy time period, she alleges that defendant, in lewd and vulgar language, discussed in detail his own prior sexual experiences, ordered her to read pornographic poetry which contained extensive sexually explicit references and recitals regarding sexual intercourse, inquired as to her own sexual experiences, and made vivid expressions of his own imagination of her reactions to sexual intercourse with him and of having sexual relations with her, recited the content of sexually oriented dreams he had regarding another student named Laurie, and said that he could imagine her naked and that in his opinion most men liked to fuck women. The complaint also alleges that he sat close to her and that his desk was between her and the only door to exit the office; that he kept raising the volume of the radio to prevent anyone outside the office from overhearing the conversation, and that she was thereby falsely imprisoned as well as being sexually harassed.

During these discussions, plaintiff is said to have been "impliedly invited to provide him with sexual favors in exchange for a better grade." Pretrial discovery does not support this particular allegation since plaintiff Pallett has testified that she was, as she told Professor Palma, happy to receive a grade of "C", and that in her opinion the paper she submitted was in fact entitled to receive a grade of "C". This grade was awarded to her by Palma. At the end of the conversation, defendant Palma explicitly warned plaintiff not to go home and tell her family about the discussion.

The complaint also alleges that Palma told other students of his sexual interest in plaintiff Pallett, and in other ways behaved like a cad. The Court accepts as valid for purposes of this motion the contention of plaintiff that the entire conversation constituted sexual harassment, and that the sexual harassment continued thereafter. However, in assessing the response of the College, we note that there was no touching during this lengthy conversation, no explicit request for specified sexual favors, either as a *quid pro quo* or otherwise, and no explicit threats or promises were made.[2]

The second amended complaint of Ms. Kracunas alleges that at relevant times she was employed as "Acting Director of Public Relations" and was also studying at Iona College for a Masters Degree in English, having completed more than one half of the required courses when she enrolled in July 1994 in a course entitled "Modern American Poetry" taught by Palma. She alleges that the individualized student reading list contained vulgar or sexually explicit material, as well as sacrilegious matter (Complaint ¶ 11) and on various occasions defendant Michael

---

1. Whether defendant Palma is an Instructor or a full Professor is not clear in the record. He is not a department head.

2. Although he apologized contemporaneously to both students Professor Palma has reported to the College a somewhat more attenuated version of his conversations with both plaintiffs.

Palma engaged Ms. Kracunas in "uncomfortable conversations primarily discussing sex." When calling at Professor Palma's office to receive the promised text materials, he made comments to her which amounted to sexual harassment. Again, as in the Pallett case, there was no touching during the conversation, no explicit request for specified sexual favors either as a *quid pro quo* or otherwise, and no explicit threats or promises.

Thereafter, Ms. Kracunas wrote to Professor Palma and protested his treatment of her. On August 3, 1994, Palma responded as follows:

&ast; &ast; &ast; &ast; &ast; &ast;

"I deeply regret the distress and anger that I have caused you. Your rebuke of me is quite justified. Please let me apologize to you completely and without reservation for the offense I gave you through my crudity and stupidity. I made remarks to you that should never have been made; I would be only too happy to unsay them if I could."

&ast; &ast; &ast; &ast; &ast; &ast;

"I will of course grade your work fairly. Though I cannot deny my contemptible vulgarity, I would never misuse the grading process in any vindictive or resentful way—or, for that matter, as a form of bribery; I can be crass and ignoble, obviously, but I hope that I am not petty or vicious or cruel. Since I have made it impossible for you to consult me regarding the written assignments, I will, if any of them should turn out to be inconsistent with what is expected, return them to you with explanations so that you may revise and resubmit them. For similar reasons, I would recommend that you submit the essays one at a time rather than all at once.

Please do not feel that you are required or even expected to use either of the books that I photocopied, if you do not wish to do so; you can, for those two assignments, use any of the sixty or so books on the supplemental list, or in fact any book by any twentieth-century American poet except for the eight poets on the roster for the course. As I have previously told you, I will of course furnish any statement that the registrar may need, to the effect that you have attended the classes and are fulfilling the written assignments.

Once again, I sincerely apologize to you for my grotesque and inexcusable behavior. I deeply regret violating your trust and ruining the experience of the course for you, and giving you such an uncalled-for an unwelcome insight into the complexities of human nature."

(Document 26, Exhibit "C")

Shortly thereafter Ms. Kracunas resigned from her job and sought medical care for depression resulting from the incident. In her Title VII complaint to the EEOC dated August 31, 1995, plaintiff Kracunas is more specific and alleges that she was, "forced to resign from my position because of the lack of support and failure to respond to my complaints." This resignation was effective on September 23, 1994.

*Response of Iona College*

The key issue in this case raised on this motion for dismissal following substantially completed pretrial discovery of the Title IX claim is whether defendant has proved by uncontrovertible evidence that after the point in time when it knew or should have known of the harassment, it took in each case all reasonable steps necessary to remedy the hostile environment. *Murray v. New York University College of Dentistry,* 57 F.3d 243, 251 (2d Cir.1995). The reasonableness of the response by the College to this sexual harassment must be tested consistently with all of the factual background known to its officials. In compliance with 34 C.F.R. Section 106.8, Iona maintains a Sexual Harassment Policy and detailed procedures for addressing and resolving complaints of sexual harassment. The College's Sexual Harassment Policy is set forth in the Student Handbook, the Faculty Handbook, the Sexual Harassment Task Force Statement and Procedures, and the College Campus Safety Manual, all of which are attached as exhibits to the Bloom affidavit submitted on this motion.

These procedures, which appear to be in conformity with law, provide for separate steps for resolving a complaint of sexual

harassment which include; mediation, review by the Sexual Harassment Taskforce, and/or direct resort to formal grievance procedures which may be invoked at any time by the complainant during the informal process of mediation and investigation. When a formal complaint in the nature of a petition to the President of the College is filed, an *ad hoc* committee formally investigates the harassment allegations and renders a determination. That committee's decision is then provided to the President of the College, who renders a final determination. However, if that determination is in support of removal of a faculty member, the due process provisions of the faculty's labor agreement have to be complied with.

An institution of higher learning prides itself on its atmosphere of academic freedom, and for that reason concepts of faculty tenure have been established. Defendant Michael Palma is not only a tenured faculty member, he is also the beneficiary of a collective bargaining agreement in which his rights are protected by an active labor union known as the American Association of University Professors.

Charges of sexual harassment in the academic world today carry a high level of stigma, and because such incidents usually occur in a one on one situation, and sometimes turn out to be unfounded, a college administrator undertakes a heavy burden in accusing a tenured faculty member of sexual harassment. If allegations of the sort present in this case are true, the faculty member might well be discharged and under the relevant collective bargaining agreement (Exhibit "K" to Bloom Affidavit) this may be done only after a full due process hearing based on competent evidence supported by witnesses, subject to confrontation by the accused.

It was against this factual background that the College responded to these complaints.

It was not until late September or early October during the ensuing Fall semester, that Ms. Pallett, who was then a student in another elective course taught by Palma, reported the May 1994 incident to Dean Michael McGrath. He referred her to Dr. Ingrid Grieger, Director of Iona's Counseling Center. After some discussion Ms. Pallett authorized Dr. Grieger to notify Dean Warren Rosenberg and Brother John Gallagher, the Vice President of Academic Affairs.

Thereafter on November 17, 1994, Palma approached Dean McGrath at a football game and acknowledged his regret and willingness to rectify the situation. From this McGrath concluded for the first time that Palma was admitting to having harassed Ms. Pallett.

Thereafter, in late November Dean McGrath met with Ms. Pallett and her parents regarding the incident. At that time he informed them that the College could not then take action to dismiss Palma absent a formal complaint because of the level of proof required where a tenured professor is involved, and furthermore that a formal complaint would be required before a hearing directed to academic tenure could be scheduled. This advice was truthful and consistent with the faculty agreement.

On December 1, 1994, for the first time, Ms. Pallett made a formal complaint to the College. The College responded immediately by suspending Palma from teaching or advising students and thereafter he was notified that proceedings would be commenced against him pursuant to the collective bargaining agreement looking towards terminating his tenure.

Ms. Kracunas' allegations of sexual harassment parallel those of Pallett and are based on salacious statements made to her by defendant Palma during a twenty minute conversation in his office on July 27, 1994 as well as on the nature of course reading materials he provided to her during that meeting, which she has never read.

On July 28 and 29, 1994, Ms. Kracunas discussed the incident with her supervisor in connection with her public relations work, Pearl Copeland. On July 29, 1994 she complained for the first time to Dean McGrath. Dean McGrath provided her with copies of the relevant college policies and offered to assist her in filing a formal complaint. At that time Ms. Kracunas specifically told Dean McGrath that she did not want him to take any action at that time and instructed him to keep her complaint *confidential* (deposition of Ms. Kracunas pp. 90–91).

A college official would seem to be morally bound to accept such a direction on the part of a student that confidentiality be maintained. However, on August 2nd, Ms. Kracunas wrote directly to Professor Palma objecting to his conduct and advising that she would not be attending class. On August 4th, Palma apologized to Ms. Kracunas for his conduct. She resigned from her employment with the College on September 23, 1994 and never initiated any further contact with College officials regarding her allegations of sexual harassment.

Following her resignation and in October 1994, Dean McGrath contacted Ms. Kracunas to advise her that another student had come forth with a claim of sexual harassment by Professor Palma, and requested a meeting with Dr. Grieger to discuss Kracunas' allegations. With Ms. Kracunas permission, Dean McGrath caused Dr. Grieger to contact Ms. Kracunas to set up a meeting. This meeting occurred in late October 1994.

Ms. Kracunas described the incident and turned over copies of her letter and defendant Palma's response, as well as the sexually explicit reading materials which had been given to her during the July 27, 1994 meeting. Dr. Grieger asked Ms. Kracunas to meet with Dean Rosenberg concerning the subject, but Kracunas said she wished to talk with her attorney before doing so.

A couple of weeks later Dr. Grieger again contacted Ms. Kracunas to ascertain whether she was willing to pursue further action. Ms. Kracunas again stated that she had not yet talked to an attorney and was not willing to proceed further until she had done so. Ultimately on December 16, 1994, Ms. Kracunas met with Dr. Grieger and Dean Rosenberg. Dean Rosenberg asked Ms. Kracunas to advise him whether she was willing to invoke the College's internal procedures for investigating her allegations and offered to help her to complete her course work for credit.

Ms. Kracunas never pursued the matter further with the College, choosing instead to commence a lawsuit.

Notwithstanding the total lack of cooperation on the part of Kracunas, on December 16, 1994, Dean Rosenberg met with Palma, informed him of the allegations and sought his response. Thereafter, he informed defendant Palma and Dr. Pendelton, the faculty representative equivalent to a shop steward, that he planned to suspend Palma from teaching and in fact the College did so. Dean Rosenberg also asked department head Dr. Winslow to make arrangements to have someone else teach Palma's classes.

In early January 1995, again with no cooperation from these plaintiffs, Dean Rosenberg interviewed members of the faculty and students and obtained written statements. As was to be expected, on January 11, 1995, the AAUP, the collective bargaining representative for the faculty, through Dr. Pendelton advised the college that the AAUP would object to *any* disciplinary action taken against Palma, presumably for lack of competent proof. Palma remains suspended, but his tenure has not been revoked.

The record submitted in connection with the motions is clear that immediately upon being informed of these complaints the College made continued reasonable efforts to resolve the problems of the plaintiffs and to gain their participation in investigation of their allegations and their cooperation in connection with due process proceedings to terminate Professor Palma. They refused or failed to do so, apparently being more interested in pursuing their litigation.

*Discussion*

█ Upon the uncontested facts, it is clear that the Title VII Claim of plaintiff Kracunas must fail. The Title VII violation was complete as of the date of her constructive discharge, if indeed a reasonable juror could find on these facts that there was a constructive discharge. This event occurred no later than September 23, 1994.

The Statute of Limitations for filing a charge of discrimination with the EEOC is 300 days. This plaintiff did not file her charges until on or after August 31, 1995 (see Ex. "G" to Doc. 18). It is absurd to suggest that a continuing employment discrimination existed after the employment terminated. For that reason alone, and without reaching the issue of whether there was an adverse

employment action taken by the College in the nature of a constructive discharge, the Title VII claims must be and hereby are dismissed.

Insofar as concerns the Title IX claims of both plaintiffs, this Court concludes that on the undisputed facts no reasonable trial juror could find liability on the part of the College, because the College upon learning of plaintiff's sexual harassment allegations took appropriate remedial action and to the extent that it was unable to or failed to take appropriate remedial action the College was prevented from doing so by the failure and active refusal of the plaintiffs to cooperate with the College administration in pressing formal charges and testifying at the necessary faculty hearing to terminate Palma's tenure upon the required finding of gross misconduct.

Our Court of Appeals has concluded that "in a Title IX case for gender discrimination based upon the sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title VII." *Murray v. New York University College of Dentistry*, 57 F.3d 243, 249 (2nd Cir.1995). While formulating this rule, the *Murray* court did not have occasion to determine what standard of constructive notice should be applied in Title IX cases. In a commercial context under Title VII, an employee's conduct will be imputed to the employer where (1) the employee is in a supervisory role and uses actual or apparent authority to further the harassment or if the supervisor was otherwise aided in accomplishing the harassment by the existence of an agency relationship; (2) the employer provided no reasonable avenue of complaint; or (3) that the employer knew of the complaint but did nothing about it. *Tomka v. Seiler Corp*, 66 F.3d 1295, 1305 (2nd Cir.1995).

Under agency principles, Professor Palma obviously did not have actual authority of the college to act as he allegedly did. Nor would it have been reasonable for the plaintiff's to have believed that Professor Palma was acting with apparent authority. Accepting the allegations as true, it is clear that Professor Palma was acting adversely to the institution itself, unlawfully, and in contravention of its express, detailed published policies previously noted. Under these circumstances, this Court concludes that any alleged harassment in the present case was not furthered by Professor Palma's actual or apparent authority nor was he otherwise aided by the existence of an agency relationship [3] and thus no liability should attach to the college on that basis. *Gary v. Long*, 59 F.3d 1391 (D.C.Cir. 1995); *Bouton v. BMW of North America, Inc.*, 29 F.3d 103 (3rd Cir.1994); *Watts v. City of New York Police Department*, 724 F.Supp. 99, 106 (S.D.N.Y.1989) (Sweet, J.).

That a faculty member on occasion will violate the published policies of an institution and do so clandestinely, as here, is not a basis for students or employees who have eschewed the established procedures for rectifying the wrong done to them, to run instead to the courts, to mulct the charitable funds of a non-profit teaching institution. Those funds could be used better for the instruction of other students.

While our Court of Appeals on occasion has applied Title VII precedent to Title IX claims, the question of whether the "employer", here the teaching institution, either failed to provide a reasonable remedy or knew of the harassment but did nothing about it, remains an issue in such cases, which must be proved by plaintiff. See, *Murray v. New York University College of Dentistry*, supra. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (2nd Cir.1992). The institution of higher learning satisfies its legal obligation under facts similar to these cases unless it provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. *Kotcher*, 957 F.2d at 63. See 29 C.F.R. § 1604.11(d).

**3.** While a supervisor will always in a sense be "otherwise aided by the existence of an agency relationship", comment e to the Restatement (Second) of Agency suggests that this exception embraces a narrower concept that holds the employer liable only if the tort was accomplished by an instrumentality or through conduct associated with the agency status. *Gary v. Long*, 59 F.3d 1391, 1397 (D.C.Cir.1995)

Iona College complied in full with its obligations under the law by providing a policy against sexual harassment and a complaint procedure, copies of which were properly provided to all students and faculty. The College responded adequately to the complaints, which as to Pallett were somewhat late in arriving.[4] That rumors may have circulated prior thereto, as plaintiffs claim but have not proved, does not substitute for actual or constructive notice of the existence of the problem, nor do rumors trigger a duty to respond. Immediately upon receiving notice, the College responded to these cases promptly, effectively and sympathetically. As noted earlier, in the context of these cases we cannot fault a college administrator placed under the seal of confidentiality by a student from adhering to the obligation of confidentiality thereby imposed.

The conflict between the obligations of a teaching institution under Title IX and its obligations to its faculty members under the First and Fourteenth Amendment and the principles of academic freedom which necessitate faculty tenure, were known to Congress in enacting Title IX and are a part of the historical and factual background against which the adequacy of the response of the College is to be judged. As noted earlier, the College did all it could, and was, and indeed remains, powerless to do anything more about terminating Professor Palma, absent further voluntary participation of the victims. This has not been forthcoming because litigation for money damages in this Court appears to be more attractive to them.

■ Defendant Palma is not a proper party either as an employer or a teaching institution. The federal claims against him are dismissed on the Court's own motion. *Tomka v. Seiler Corp*, 66 F.3d 1295 (2nd Cir. 1995).

The motions by Iona College for summary judgment are granted in each of these consolidated cases.

The various pendent state law claims alleged are each dismissed without prejudice.

The Clerk shall enter a final judgment.

SO ORDERED.

---

4. At the time of the harassment of Ms. Kracunas the College administration had not yet received information concerning the harassment of Ms. Pallett.