Christine **KRACUNAS** and Darleen E. Pallett, Plaintiffs–Appellants,

v.

**IONA COLLEGE** and Michael Palma, Defendants–Appellees.

Nos. 290, 879, Dockets 96–7128, 96–7144.

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 1996.

Decided June 26, 1997.

Gregg D. Minkin, White Plains, NY (Joseph A. Maria, P.C., White Plains, NY, of counsel), for Plaintiff–Appellant Kracunas.

Craig Dickinson, White Plains, NY (Jonathan Lovett, Lovett & Gould, Esqs., White Plains, NY, of counsel), for Plaintiff–Appellant Pallett.

Elise M. Bloom, New York City (Jennifer B. Courtian, Jackson, Lewis, Schnitzler & Krupman, New York City, of counsel), for Defendant–Appellee Iona College.

Stephen Holden III, White Plains, NY (Holden Brothers, P.C., White Plains, NY, of counsel), for Defendant–Appellee Palma.

(John F. Suhre, Equal Employment Opportunity Commission, Washington, DC, C. Gregory Stewart, General Counsel, Gwendolyn Young Reams, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Equal Employment Opportunity Commission, Washington, DC, on the brief), for Amicus Curiae The Equal Employment Opportunity Commission.

Before: OAKES, LEVAL and PARKER, Circuit Judges.

PARKER, Circuit Judge:

Appellants Christine Kracunas and Darleen E. Pallett appeal from the judgment of the United States District Court for the Southern District of New York (Charles L. Brieant, *Judge*) granting summary judgment in favor of Iona College and Professor Michael Palma. This appeal requires us to determine the circumstances under which a college may be liable under Title IX for the hostile environment sexual harassment of a student by a professor.[1] We hold that lia-

bility for the professor's conduct should be determined under the same standard that applies to hostile environment sexual harassment claims arising under Title VII. Because issues of fact exist as to: (1) whether Palma relied upon his actual or apparent authority in carrying out the harassment; (2) when Iona had notice of the hostile environment created by Palma; and (3) whether Iona's response to that notice was appropriate, the district court erred in granting summary judgment in favor of Iona. Accordingly, we vacate the district court's grant of summary judgment and remand for further proceedings.

## I. BACKGROUND

Because summary judgment was granted against Pallett and Kracunas, we consider the evidence in the light most favorable to them. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 710 (2d Cir.1996) (citing *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202–03 (2d Cir.1995)).

### A. *Incidents of Sexual Harassment*

Darleen E. Pallett and Christine Kracunas are both former students of Iona. In addition, Kracunas is a former employee of Iona. After spending one semester at another university, Pallett transferred to Iona in the fall of 1992. Kracunas began working at Iona as assistant director of Public Relations in June 1991. In the spring of 1992, Kracunas enrolled at Iona as a graduate student pursuing a Masters degree in English.

While students at Iona, both Pallett and Kracunas took English courses taught by Professor Michael Palma. Palma was a full-time, tenured faculty member in the English Department of Iona's School of Arts and Sciences. Pallett attended a course in British poetry that was offered in the spring of 1994. Kracunas took a course entitled "Modern American Poetry" during the summer of 1994.

---

1. Appellants do not appeal the district court's grant of summary judgment in favor of Michael Palma; nor does appellant Christine Kracunas appeal dismissal of her Title VII claims.

### 1. *Pallett*

Pallett received a grade of "F" on a paper she wrote as an assignment for Palma's British poetry class. Pallett contacted Palma's office to schedule an appointment to discuss her paper. The appointment was scheduled for May 19, 1994, at Palma's office in the English House on the Iona campus.

When Pallett arrived for her appointment, Palma closed the door to his office, turned up the radio, and sat in a chair in front of the door. He then embarked upon a sexually explicit discussion of his personal sexual history, fantasies, and opinions. Palma closed his eyes, licked his lips, and rubbed his hands together while discussing these offensive topics with Pallett. Palma used explicit language, and several of his remarks were directed specifically towards Pallett. For example, Palma told Pallett that he envisioned her naked, stated that he was likely to have a sexual dream about Pallett, and inquired into Pallett's personal sexual activity. He also gave Pallett sexually explicit poetry and requested that she read it in his presence.

It was not until after Pallett indicated that she had to go home that Palma finally suggested looking at his grade book. Without reviewing her paper or final exam, Palma asked Pallett if she would be happy with a final grade of "C" for the course. Pallett said that she would. Pallett later indicated that she believed a grade of "C" was fair for the course.

### 2. *Kracunas*

On July 27, 1994, Palma offered to give Kracunas some special reading assignments as part of the course-work for his Modern American Poetry class. At the time that Palma made this offer, he did not have the assignments with him. He told Kracunas that he would bring the assignments to class that evening. At class, however, Palma said that he had forgotten the assignments. He then suggested that Kracunas accompany him to his office in the English House after class to get the assignments.

At around 10:00 p.m. that evening, Kracunas and Palma went back to Palma's office. While they were in his office, Palma made inappropriate sexual remarks to Kracunas. He told Kracunas that he wanted to have sex with her, described her physique in explicit terms, and used foul language to discuss a variety of other topics of a sexual nature. In addition, the reading material that Palma gave to Kracunas was sexually explicit.

### B. *Notice to Iona and Iona's Response*

On July 28, 1994, Kracunas told her immediate supervisor, Pearl Copeland, who was director of Development, about her July 27 experience in Palma's office. Kracunas contends that Copeland's reaction to her complaint was "callous" and made her feel worse. Copeland did not report the incident to anyone.

The next day, Kracunas approached Dean of Students Michael McGrath to report the July 27 incident with Palma. After hearing the details of the incident, Dean McGrath gave Kracunas a copy of Iona's Sexual Harassment Task Force Statement and Procedures, which explained the procedure for filing a sexual harassment complaint.[2] According to that procedure, mediation is the first step in solving any complaint of sexual harassment. To initiate the mediation process, a victim of sexual harassment may contact one of several "responsible employees," including the appropriate mediator or a member of the Sexual Harassment Task Force. When the accused is a student, the Dean of Students is the appropriate mediator. When the accused is a faculty member, the appropriate mediator is the dean of the school to which the accused reports.

Once the mediator has conducted an investigation, he or she will propose a settlement. A party who is not satisfied with the proposed settlement may ask the mediator to convene the Task Force to review the pro-

---

**2.** Pursuant to 34 CFR § 106.8, all education programs receiving federal financial assistance must designate at least one "responsible employee" to investigate complaints of sexual harassment and must "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints" of harassment. *See id.* § 106.8(a)–(b). Iona is subject to this requirement because it and its students regularly receive federal loans and subsidies.

posed settlement. In addition, the aggrieved always has the option of initiating a formal grievance by petitioning the president or the president's designee within thirty days of the alleged harassment or the conclusion of a failed mediation.

Dean McGrath offered to assist Kracunas in filing a sexual harassment complaint against Palma. Dean McGrath also told Kracunas that he would contact security so that if Kracunas felt afraid, she could go directly to security for help. Iona contends but Kracunas denies that she asked Dean McGrath to keep her allegations concerning Palma confidential or that she asked him not to take any action with respect to her complaint.

On August 2, 1994, Kracunas sent Palma a letter expressing her disapproval of his July 27 conduct towards her. Palma responded to Kracunas by letter the next day, admitting to "a stunning and inexcusable lapse of judgment and responsibility" and expressing apologies for his "grotesque and inexcusable behavior." Kracunas showed Palma's letter to Pearl Copeland and to Dean McGrath.

On September 23, 1994, Kracunas resigned from her employment at Iona. Kracunas contends that her resignation was due to the July 27 incident with Palma and Iona's failure to do anything about it.

Around the same time that Kracunas left Iona, Darlene Pallett went to Dean McGrath to obtain literature on sexual harassment. At that time, Pallett was enrolled in another class taught by Palma. In addition, Palma was scheduled to serve as Pallett's mentor for student teaching. Upon Dean McGrath's urging, Pallett described how she had been sexually harassed by Palma on May 19. Dean McGrath gave Pallett a copy of Iona's Sexual Harassment Task Force Statement and Procedures and explained to her how to pursue a sexual harassment complaint. Pallett contends that when she told Dean McGrath about her experience with Palma, Dean McGrath said that there had been at least five other complaints against Palma from students and faculty.

With Pallett's permission, Dean McGrath told Dr. Ingrid Greiger, director of Iona's Counseling Center and coordinator of Iona's Women's Studies Program, about the incident with Palma for the purpose of getting Pallett counseling. Pallett began seeing Dr. Greiger for counseling in early October 1994. At that time, Pallett authorized Dr. Greiger to discuss the harassment further with Dean McGrath, Dean Warren Rosenberg, Dean of the School of Arts and Sciences, and Vice President of Academic Affairs, Brother John F. Gallagher. Sometime in November, Dr. Greiger informed Dean Rosenberg of Pallett's complaint against Palma, but she did not reveal Pallett's identity.

On November 17, 1994, Palma approached Dean McGrath at a football game and said that he understood that there had been a complaint filed against him. Palma did not identify the complainant. He then said, "I'm sorry, I was wrong, I've changed, I'll do anything to rectify this." Palma asked Dean McGrath to give the complainant the message that she could have a new mentor for student teaching. From this, Dean McGrath deduced that Palma was talking about Pallett. Dean McGrath considered Palma's statement an admission of inappropriate conduct. Later that day, Dean McGrath gave Palma a copy of Iona's sexual harassment policy. Dean McGrath also reported the conversation to College Vice President Gallagher.

In late November, Dean McGrath met with Pallett and her parents at a local diner to discuss Pallett's complaint against Palma. According to Pallett's father, Paul Pallett, Dean McGrath told him at this meeting that there had been several other harassment complaints against Palma.

On November 30, a meeting was held among Pallett, Dean McGrath, and Dr. Greiger. Pallett informed Dean McGrath and Dr. Greiger that Professor Thomas Pendleton, an English professor and president of the local chapter of the American Association of University Professors, the collective bargaining representative for Iona's faculty members, had recently suggested to Pallett that she had misunderstood Palma and that in fact Palma was a wonderful teacher. About that time, Pallett also found out that Palma was discussing the situation with oth-

er professors and students. Dr. Greiger called Dean Rosenberg and asked that a cease and desist order be issued to avoid further intimidation. This time, Dr. Greiger identified Pallett as the complainant.

That same day, Dean Rosenberg informed Palma that Pallett had lodged a complaint against him. They discussed the possibility of mediating a settlement pursuant to the procedures set forth in Iona's sexual harassment policy.

On December 1, Dean Rosenberg and Dr. Greiger met with Pallett and her parents. Pallett gave Dean Rosenberg a written complaint that Dr. Greiger had helped her to prepare. Dean Rosenberg later gave a copy of the written complaint to Palma. At the meeting, it was decided that Pallett would complete the remainder of her school work at home. According to Paul Pallett, Dean Rosenberg also told them that four or five other students had complained about Palma.

On December 16, Kracunas met with Dean Rosenberg and Dr. Greiger. She related the details of her July 27 meeting with Palma and showed them Palma's letter. She also discussed her feelings that Iona had not responded to her complaint properly.

That same day, Dean Rosenberg called a meeting with Palma, Professor Winslow, head of the English Department, and Professor Pendleton. The purpose of the meeting was to inform these faculty members of the complaints filed by Kracunas and Pallett and to discuss removing Palma from his spring teaching assignments.

On January 20, 1995, Palma's teaching and advising duties were formally suspended. Palma was allowed to enter campus with advanced notice to Dean Rosenberg.

Commencing in January, Dean Rosenberg encouraged Pallett and Kracunas to participate in Iona's internal grievance procedures. Believing that Iona's response to their complaints during the preceding months had been inadequate, both students chose not to participate in those procedures and instead filed lawsuits.

On March 15, 1995, Dean Gallagher began the process to convene an ad hoc committee to conduct a formal investigation into the harassment claims. On May 23, Dean Rosenberg asked the committee to consider formal charges of sexual harassment against Palma. Dean Rosenberg provided the committee with information compiled during his investigation of Pallett's and Kracunas's complaints against Palma.

In September 1995, Iona commenced termination proceedings against Palma pursuant to section 5.2 of the Iona Faculty Handbook.

### C. District Court Opinion

The district court found, for purposes of Iona's summary judgment motion, that the conversations that occurred between Palma and Pallett on May 19, 1994, and Palma and Kracunas on July 27, 1994, constituted hostile environment sexual harassment. See Pallett v. Palma, 914 F.Supp. 1018, 1020 (S.D.N.Y.1996). The district court noted, however, that there was no physical contact during these conversations, that Palma made no specific request for sexual favors, and that Palma made no threats or promises to either student. See id.

Relying upon this Court's decision in Murray v. New York Univ. College of Dentistry, 57 F.3d 243 (2d Cir.1995) (holding that Title VII standards should govern a university's liability for a dental student's claim of hostile environment sexual harassment brought under Title IX), the district court concluded that Iona should not be liable for Palma's conduct. First, the district court concluded that Palma had not acted with actual or apparent authority to harass the plaintiffs, nor was he aided in the harassment by the existence of the agency relationship. Therefore, the district court concluded that no liability should attach to Iona on that basis. See 914 F.Supp. at 1024.

Next, the district court analyzed whether Iona "provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." Id. The district court determined that Iona did provide a reasonable avenue of complaint via its sexual harassment policy. Further, it found that "[i]mmediately upon receiving notice, the College responded to these cases promptly,

effectively and sympathetically." *Id.* at 1025. Therefore, because it determined that Iona's response was proper as a matter of law, it granted summary judgment in favor of Iona. *See id.*

## II. DISCUSSION

■ This Court reviews the district court's grant of summary judgment de novo. *See Catlin v. Sobol,* 93 F.3d 1112, 1116 (2d Cir. 1996).

### A. *Standard of Liability*

■ Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, prohibits educational institutions receiving federal financial assistance from discriminating against students or employees on the basis of sex. *See* 20 U.S.C. § 1681(a) [3]; *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 520–34, 102 S.Ct. 1912, 1917–25, 72 L.Ed.2d 299 (1982). When a teacher sexually harasses a student, that teacher " ' "discriminates" on the basis of sex' " in violation of Title IX. *See Franklin v. Gwinnett County Pub. Schools,* 503 U.S. 60, 75, 112 S.Ct. 1028, 1037–38, 117 L.Ed.2d 208 (1992) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)). A student may assert a private cause of action for damages directly against an educational institution for conduct violating Title IX. *See id.,* 503 U.S. at 76, 112 S.Ct. at 1038; *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Murray,* 57 F.3d at 248.

In *Murray,* we held that, "in a Title IX suit for gender discrimination based on sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title VII." *Murray,* 57 F.3d at 249. Under Title VII, an employer may be liable for the conduct of an employee under two circumstances. First, if the employee is the plaintiff's supervisor, and the employee uses " 'his actual or apparent authority to further the harassment . . . [or] was otherwise aided in accomplishing the harassment by the existence of the agency relationship,' " then the employer is liable for the harassment. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2nd Cir.1995) (quoting *Karibian v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir.1994)). Second, if the employee is a low-level supervisor who does not rely on his supervisory authority to carry out the harassment, or the employee is the plaintiff's coworker, then the employer is liable for the harassment only if it " ' "provided no reasonable avenue of complaint or knew of the harassment but did nothing about it." ' " *id.* (quoting *Karibian,* 14 F.3d at 780 (quoting *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 63 (2d Cir.1992))).

In *Murray,* a dental student alleged that she was harassed by a patient at the university dental clinic. *See* 57 F.3d at 245. Therefore, we applied the Title VII standard applicable to harassment perpetrated by a coworker or low-level supervisor. Thus, we considered whether the university " 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.' " *Id.* at 249 (quoting *Kotcher,* 957 F.2d at 63). Because we concluded that Murray's complaint failed to allege that the university had either actual or constructive notice of the harassment, we affirmed the district court's dismissal of her claim. *See id.* at 250–51.

We must decide whether the standard that we applied in *Murray* also should apply to the situation where a college student has been sexually harassed by a professor, or whether the standard applicable when a supervisor relies upon his authority to further harassment should apply. Under the latter standard, if Palma had supervisory authority over Pallett and Kracunas, and if he capitalized upon that authority to harass them, then Iona is liable for his conduct. *See Tomka,* 66 F.3d at 1305–07.

The record suggests that Palma was much more like a supervisor to Pallett and Kracunas than a coworker. As their professor

---

**3.** The statute provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a).

(and as Pallett's mentor), Palma had authority to assign, review, and grade their work; in addition, he might be called upon to provide career counseling or an employment recommendation. Thus, Palma was in a position to have a significant effect on Pallett's and Kracunas's academic and professional success. *See id.* at 1306 (finding evidence sufficient to raise a fact issue as to whether two employees were the aggrieved's supervisors where those employees could review the aggrieved's performance and report unfavorably, thereby affecting the aggrieved's future with the employer).

In addition, there is evidence suggesting that Palma capitalized upon his authority as a professor to further his harassment of Pallett and Kracunas. For example, Palma used the May 19 meeting, which Pallett had arranged to discuss the grade of "F" that she had received on a required paper, to sexually harass Pallett. Similarly, on the evening of July 27, Palma asked Kracunas to accompany him to his office after class to retrieve special reading assignments for Kracunas's Modern American Poetry class. Palma then exploited this requirement to create an opportunity to subject Kracunas to sexual harassment. *Cf. id.* at 1306–07 (finding allegations that supervisor convened business dinner and encouraged drinking at that dinner, thus enabling assault on plaintiff, sufficient—if proven—to hold employer automatically liable for conduct).

On the other hand, professors are not necessarily high in the hierarchy of college officials. We have previously refused to impute liability to an employer for a low-level supervisor's hostile environment harassment of an employee. *See Kotcher,* 957 F.2d at 64. Palma in particular had no decision-making authority with respect to Iona and no ability to bind Iona to any commitment outside the classroom.

Moreover, the Supreme Court and this Court have consistently emphasized the importance of " 'freedom in the community of American universities' ". *See, e.g., Dube v. State Univ. of New York,* 900 F.2d 587, 597–98 (2d Cir.1990) (quoting *Sweezy v. New*

*Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957)). Iona argues that imposing absolute liability on colleges for verbal harassment not containing any threats or promises would severely restrict this freedom, as colleges, in an attempt to avoid liability, would be forced to monitor their professors' speech and teaching materials. Such meticulous oversight also may risk infringing the professors' professional agreements [4] and First Amendment rights. *See id.* at 598 (citing cases).

As this analysis illustrates, the nature of the student-professor relationship, combined with the unique hierarchy of academic institutions, makes precise application of Title VII principles difficult; nor are we required to import the entire Title VII jurisprudence and apply it to all issues arising under Title IX. *See Bruneau v. South Kortright Cent. Sch. Dist.,* 935 F.Supp. 162, 169–70 (N.D.N.Y.1996); *see also Murray,* 57 F.3d at 249 (stating that we should apply "standards *similar* to those applied in cases under Title VII" to sexual harassment claims arising under Title IX (emphasis added)); *Karibian,* 14 F.3d at 779 (noting that "[a] rule of employer liability deriving from traditional agency principles cannot be reduced to a universal, pat formula").

Nonetheless, we are unpersuaded that we should deviate in this case from application of the same agency principles that we relied upon in *Karibian, Tomka,* and *Murray.* Pursuant to those principles, an employer will be liable for the torts of its employees if the employee " 'purported to act on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.' " *Karibian,* 14 F.3d at 780 (quoting Restatement (Second) of Agency §§ 219(1) & (2)(d) (1958)); *see Tomka,* 66 F.3d at 1305; *Murray,* 57 F.3d at 249. Here, Palma was most certainly acting as Iona's agent in his role of college professor. That very role furthered Iona's goal of attracting students to the college and placed Palma in a position of authority vis a vis his

4. As a tenured faculty member, Palma's rights were protected by an active labor union known as the American Association of University Professors.

students. His blatant abuse of that authority, if proven, is sufficient under agency principles to impute liability to Iona. In the employment context, similar conduct by a supervisor undoubtedly would visit liability on the employer. College students should not receive less protection from conduct that is shown to be harassment (as opposed to teaching) than do employees in the workplace. *See Doe v. Petaluma City Sch. Dist.,* 949 F.Supp. 1415, 1426 (N.D.Cal.1996); *see also* 61 Fed.Reg. 52172, 52173 (providing that a school's liability for sexual harassment by a teacher should be determined by application of agency principles); *cf. Franklin,* 503 U.S. at 75, 112 S.Ct. at 1037–38 (providing that the "same rule" prohibiting sexual harassment of employees should apply to students who are harassed by a teacher); *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1917–18, 72 L.Ed.2d 299 (1982) (in holding that Title IX prohibits discrimination on the basis of sex with respect to employment, the Court stated that to give Title IX " 'the scope that its origins dictate, we must accord it a sweep as broad as its language' " (quoting *United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966))).

■ Moreover, there is no sound basis for Iona's argument that imputing liability to a college under these circumstances would pose a risk to academic freedom. The evidence includes conduct of Palma which Iona does not contend was done in good faith as a part of his teaching, nor could his conduct reasonably be seen as appropriate to further a pedagogical purpose.[5] Harassing conduct fitting this description is not entitled to constitutional protection. *See Roberts v. United States Jaycees,* 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984). In addition, Iona's prediction that colleges would begin monitoring their professors' speech and teaching materials in an effort to avoid liability is unfounded. It is desirable that

colleges will make efforts to educate their faculty about sexual harassment and implement effective sexual harassment policies. To the extent such efforts cause some incidental inconvenience to colleges and professors, that inconvenience is justified in light of the colleges' legitimate goal of eradicating sexual harassment. *Cf. id.* ("[I]f enforcement of the [Minnesota Human Rights] Act causes some incidental abridgement of the Jaycees' protected speech, that effect is no greater than is necessary to accomplish the State's legitimate purpose.").

■ Thus, we hold that if a professor has a supervisory relationship over a student, and the professor capitalizes upon that supervisory relationship to further the harassment of the student, the college is liable for the professor's conduct. If a professor does not rely upon his actual or apparent authority to carry out the harassment, the college will be liable only if it provided no reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.

■ We pause to note that in *Murray,* we declined to decide to what extent a constructive notice standard should apply to cases arising under Title VII or Title IX. *See* 57 F.3d at 250. We have since held that notice under Title VII includes both actual and constructive notice. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996). We now extend that holding to claims of hostile environment sexual harassment arising under Title IX. *See Kinman v. Omaha Pub. Sch. Dist.,* 94 F.3d 463, 469 (8th Cir.1996); *Lipsett,* 864 F.2d at 901; *Petaluma City Sch. Dist.,* 949 F.Supp. at 1426, 61 Fed.Reg. 52172, 52173; *cf. Doe v. Claiborne County,* 103 F.3d 495, 504–05, 515–16 (6th Cir.1996) (reversing district court's exclusion of plaintiff's "knew or should have known" evidence from Title IX claim).[6]

---

**5.** There will undoubtedly be cases which will arise where the line between pedagogy and harassment will be difficult to draw. Teachers of drama, dance, music, and athletics, for example, appropriately teach, in part, by gesture and touching. However, that is not this case. Nothing that we have said here should undermine the use of these legitimate teaching methods.

**6.** *But see Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648, 652–53 (5th Cir.1997) (holding that school districts are not liable for teacher-student harassment under Title IX unless super-

## B. Application of Standard

### 1. Abuse of Authority

■ It is undisputed that the incidents of harassment occurred while Pallett and Kracunas were students in Palma's classes. Therefore, Palma had supervisory authority over them at the time he embarked upon the harassment.

In addition, a factfinder could find that (1) Palma gave Pallett an "F" on her paper as a ruse to lure her to his office to further his sexual designs; (2) he made an appointment for Pallett to come to his office as a means to further these sexual designs; (3) he used his professorial authority to provide Pallett with a final grade of "C", perhaps to thank her for submitting to his abuse, perhaps to buy her silence, or perhaps to induce her to further submission; (4) he used his authority as Kracunas's professor to assign her special reading, which could be found to have been a device to initiate sexual harassment; and (5) he exploited his professorial authority by asking Kracunas to come with him to his office to retrieve reading material and then harassing her.

In sum, there is evidence suggesting that Palma capitalized upon his supervisory authority to further the harassment of Pallett and Kracunas. Therefore, the district court erred in granting summary judgment to Iona on this issue.[7]

### 2. Failure to Act

Even if the factfinder determines that Palma did not rely upon his supervisory relationship as a means of furthering the harassment, Iona nevertheless may be liable for his conduct if it failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable case should have known, about the harassment yet failed to take appropriate remedial action.

■ Whether Iona provided Pallett and Kracunas with a reasonable avenue for complaint is a question of fact for a jury. See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1181 (2d Cir.1996). Although Iona maintained a sexual harassment policy that complied with the requirements of 34 CFR § 106.8, the mere existence of reasonable complaint procedures does not insulate Iona from liability for sexual harassment claims. See id. at 1180–81 (citing Vinson, 477 U.S. at 72, 106 S.Ct. at 2408). Based on the record, a jury could conclude that Pallett and Kracunas invoked the internal grievance procedures when they went to Dean McGrath with their complaints, but that Iona failed to respond to their complaints in a timely fashion.

■ In addition, there is evidence suggesting that Iona knew about the hostile environment created by Palma but failed to take appropriate remedial action. In Murray, we suggested that an employer has notice of sexual harassment when supervisory or management-level employees have notice. See Murray, 57 F.3d at 249–50; Van Zant, 80 F.3d at 715. The supervisor must be " 'at a sufficiently high level in the hierarchy' " before knowledge of the harassment will be

visory employee knew of the abuse and failed to take action); Linson v. Trustees of the Univ. of Pa., No. Civ.A. 95–3681, 1996 WL 479532, *3–4 (E.D.Pa. Aug.21, 1996) (holding that university's failure to eradicate hostile environment created by peer harassment only actionable where discriminatory intent is shown); Bruneau, 935 F.Supp. at 173 (holding that school district may be liable for the peer harassment of an elementary student only where school had actual notice of harassment and failed to take appropriate action); Nelson v. Almont Community Schools, 931 F.Supp. 1345, 1355 (E.D.Mich.1996) (applying Title VI intentional discrimination standard to a high school student's claim of sexual harassment by a teacher); Howard v. Board of Educ. of Sycamore Community Unit Sch. Dist. No. 427, 876 F.Supp. 959, 974 (N.D.Ill.1995) (holding that school board may not be liable for alleged

harassment of band teacher unless "the Board knew of, or was directly involved in, any of the alleged discriminatory conduct").

7. The district court, in granting summary judgment for the defendant, assumed that Palma's conduct constituted sexual harassment, but found that under the circumstances it was not attributable to the college. We have therefore limited our review to issues of when sexual harassment is attributable to an academic institution under Title IX. By listing Palma's grading and his assignments to his students as conduct that might be found to satisfy the requirement that Palma was acting on behalf of the institution, we do not decide whether such activities, which are an integral part of teaching, could also be the basis of a finding of sexual harassment.

imputed to the employer. *See Van Zant*, 80 F.3d at 715 (quoting *Kotcher*, 957 F.2d at 64). Whether a particular school official is "at a sufficiently high level of the hierarchy" depends on the facts of each case. *See Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 401 (5th Cir.1996).

In the instant case, there are facts suggesting that Dean McGrath, as Dean of Students, may qualify as a management-level official. For example, several Iona employees reported directly to Dean McGrath.[8] Dean McGrath was required to handle any complaints directed against those employees. *See Leija*, 101 F.3d at 401 (suggesting that to qualify as management-level, a school official must have authority over employees). In addition, by virtue of his title, familiarity, and accessibility to students, it would be expected that students would approach Dean McGrath with complaints about subjects as sensitive as sexual harassment; in fact, Dean McGrath served as "chief advocate" for students with complaints regarding faculty. Further, Iona's sexual harassment policy designated Dean McGrath as a mediator for complaints of sexual harassment against students. This suggests that Dean McGrath had the power—at least in certain instances—to initiate the mediation process. *See Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 659–60 (5th Cir. 1997).

In any event, it appears from the record that Pallett went to see Dean McGrath in mid-September 1994, and a fact finder could conclude that she reasonably followed his advice in pursuing the internal grievance procedures but that Iona took no action until January 20, 1995. A fact finder could also conclude that Kracunas complained in late July 1994 to both her supervisor, Pearl Copeland, and to Dean McGrath. Fact issues exist as to whether she was required to go beyond Dean McGrath with her complaint and, once again, no action was taken until

January 1995. Therefore, the district court erred in concluding that Iona's response to the harassment—coming four to six months after Dean McGrath first learned of the allegations—was appropriate as a matter of law. *See Snell v. Suffolk County.*, 782 F.2d 1094, 1104 (2d Cir.1986) (employer must take "all reasonable measures" to enforce policy of non-harassment); *Trotta v. Mobile Oil Corp.*, 788 F.Supp. 1336, 1351 (S.D.N.Y.1992) (employer's remedy must be immediate, appropriate, and real); 29 C.F.R. § 1604.11(d) (employer liable unless it "took immediate and appropriate corrective action").[9]

To support its conclusion that Iona's response to the allegations against Palma was appropriate, the district court relied upon its findings that (1) Kracunas and Pallett asked Dean McGrath to keep their complaints confidential,[10] and (2) they refused to participate in Iona's internal grievance procedures. *See Pallett*, 914 F.Supp. at 1025. This reliance was in error.

First, the record reveals a disputed issue of fact as to whether either Pallett or Kracunas requested confidentiality. Each of them insists that she did not. Even if they had made that request, Palma approached Dean McGrath at a football game on November 17, 1994, and essentially admitted to harassing Pallett. By virtue of that approach, Brother Gallagher had notice of the allegations against Palma sometime in November. Therefore, Iona could have taken action at an earlier date without breaching any promises of confidentiality.

Second, it was after January 1, 1995, when Pallett and Kracunas expressly refused to participate in Iona's internal grievance procedures. Thus, a factual issue exists as to whether during the preceding months the students believed that they had done enough to invoke those procedures. *Cf. Vinson*, 477 U.S. at 72, 106 S.Ct. at 2408 (holding that

---

8. Although it appears that some of these employees were Iona professors, the record is unclear on that issue.

9. We are unable to tell from the record whether Kracunas's supervisor, Pearl Copeland, who had notice of Palma's conduct on July 28, 1994, may also qualify as a management-level official.

10. The district court also based its conclusion on its finding that on July 29, 1994, Kracunas told McGrath not to take any action with respect to her complaint. Although Kracunas admits in her deposition that she did not want McGrath to take any action at that time, she denies ever stating this to McGrath.

failure to follow internal grievance procedure does not necessarily insulate employer from liability for failure to respond to sexual harassment complaint).

■ Finally, the record suggests that Iona may have had constructive knowledge of the hostile environment created by Palma at a date well before December 1, 1994. An educational institution may be deemed to have constructive notice of harassment where the harassment is so pervasive that school officials should have known about it. *See Doe v. Lago Vista Indep. Sch. Dist.*, 106 F.3d 1223, 1225–26 (1997); *see also Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1512 (11th Cir.1989) ("The plaintiff can prove that the employer knew of the harassment by showing either that she complained to higher management or that the harassment was pervasive enough to charge the employer with constructive knowledge.") According to Pallett's father, Dean Rosenberg admitted to knowing of several other complaints against Palma. In addition, at least one other former Iona student, not a party in this action, claimed that she was sexually harassed by Palma.

If it is determined that Iona had actual or constructive notice of the hostile environment created by Palma yet failed to take timely and appropriate action to deal with that environment, then Iona is responsible for any damages that resulted from the delay. Sufficient fact issues exist regarding the timing and nature of notice, the supervisory level reached, and the reasonableness of the response thereto that summary judgment should not have been granted.

## III. CONCLUSION

Accordingly, the district court's grant of summary judgment to Iona is vacated and the case remanded for further proceedings consistent with this opinion.