**Gregory WILLIAMS and Leroy Williams, Plaintiffs,**

v.

**NEW YORK CITY HOUSING AUTHORITY, Defendant.**

No. 01 Civ. 1845(RLC).

United States District Court, S.D. New York.

Aug. 1, 2001.

Silberman & Rhine LLP, New York, New York, for Plaintiffs, Martin N. Silberman, Margaret McIntyre, of counsel.

Robert L. Doan, Acting General Counsel, New York, New York, for Defendant, Mark F. Walter, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Defendant New York City Housing Authority ("NYCHA") moves pursuant to Rule 12(b)(6), F.R. Civ. P., to dismiss the claim of a hostile work environment contained in plaintiffs Gregory Williams' and Leroy Williams' complaint. Plaintiffs oppose this motion.

## BACKGROUND

In considering a motion to dismiss, the court must accept all of the plaintiffs' allegations as true. *See Tarshis v. Riese Organization,* 211 F.3d 30, 35 (2d Cir.2000). Plaintiffs are both African–Americans who were employed at all relevant times as caretakers at the housing project known as Fort Independence Houses. (Compl.¶¶ 4, 5, 10.) On March 17, 1997, Gregory Williams entered the office of his supervisor, Kevin Burns, to turn in a leave of absence form and discuss a paycheck. (Compl.¶¶ 13, 17.) Gregory Williams noticed a noose hanging on the wall behind Burns's desk and then left the office without speaking to him. (Compl.¶ 17.)

Gregory Williams, and several co-workers, later confirmed that the noose remained on display in Burns's office. (Compl.¶¶ 18, 20.) In the afternoon of the following day, March 18, 1997, Leroy Williams entered Burns's office and also noticed the noose. (Compl.¶ 23.) The following morning, March 19, 1997, Gregory Williams went to Burns's office and asked Burns why the noose was hanging on the wall. (Compl.¶ 29.) Burns, visibly uncomfortable in the face of the confrontation, immediately removed the noose and stated: "you know I'm not like that," adding, "It was a joke," and "I apologize if it offended you." (Compl.¶¶ 29–31.)

On March 25, 1997, Gregory Williams filed a formal complaint regarding the noose at the NYCHA Office of Equal Opportunity ("OEO"). (Compl.¶ 33.) Leroy Williams signed a witness statement the following day to be attached to the complaint. *Id.* Plaintiffs contend that their complaint was not seriously investigated by the OEO. (Compl.¶ 38.) They also allege that their supervisors began to en-

force workplace rules more strictly against the plaintiffs than they had before the complaint was filed and that following their complaint, they were treated differently than other workers. (Compl.¶¶ 39, 40.) For example, plaintiffs' radios were confiscated while other employees simply were asked not to play theirs. (Compl.¶ 40.)

Plaintiffs filed charges of employment discrimination based upon race and retaliation with the United States Equal Employment Opportunity Commission (hereinafter "EEOC") on or about November 18, 1997. (Compl.¶ 7.) On December 7, 2000, plaintiff received a "Notice of Right to Sue" from the United States Department of Justice, Civil Rights Division. (Compl.¶ 9.) Thereafter, plaintiffs filed this complaint with the court on March 2, 2001, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The complaint contains two causes of action. First, plaintiffs contend that the defendant subjected them to a hostile work environment. Second, plaintiffs assert that they suffered retaliation for complaining of the allegedly discriminatory treatment. Defendant is seeking dismissal in this motion of the hostile work environment claim.

## DISCUSSION

A motion to dismiss will be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court must "draw inferences from [the allegations in the complaint] in the light most favorable to plaintiff, and construe the complaint liberally." *Tarshis,* 211 F.3d at 35 (citation omitted). Defendant therefore bears a heavy burden in supporting its motion.

To demonstrate a hostile work environment actionable under Title VII, the workplace must be "permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). The United States Supreme Court in *Harris* indicated that there is no precise test for determining whether conduct is severe or pervasive enough to constitute a hostile work environment but indicated that certain guideposts include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. The employment environment must be abusive both objectively and subjectively. *See id.* at 21, 114 S.Ct. 367.

In addition, plaintiffs must demonstrate "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quotation omitted). Hostile work environments are generally imputed to the employer unless the employer can demonstrate that it took appropriate action to remedy the situation. *See Wiley v. Citibank, N.A.,* 98 Civ. 1139(DAB), 2001 WL 357322, at *5 (S.D.N.Y. Mar. 31, 2001) (Batts, J.) (citing *Kracunas v. Iona College,* 119 F.3d 80, 89 (2d Cir.1997)).

In this case, the conduct which demonstrates racial animus was the dis-

play of the noose in the supervisors' office.[1] The issue therefore is whether this conduct is severe or pervasive enough to alter the conditions of the plaintiffs' employment. There is no magical formula in this determination, nor is there a specific minimum "number of incidents below which a plaintiff fails as a matter of law to state a claim." *Richardson v. New York State Dep't of Corr. Service*, 180 F.3d 426, 439 (2d Cir.1999) (quotation omitted). Generally, however, as the conduct in question becomes more severe, fewer occurrences are necessary to create a hostile work environment. Thus, while a single racist remark will usually not support a hostile environment claim, *see, e.g., Harris*, 510 U.S. at 21, 114 S.Ct. 367, a single physical assault would, *see, e.g., Tomka v. Seiler*, 66 F.3d 1295, 1305 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). These examples, while illustrative of the boundaries of the spectrum of racist conduct, provide little practical guidance in a case, like this, where the conduct falls somewhere between those extremes. The Second Circuit has offered additional guidance, noting that while a single incident must be "extraordinarily severe" to create a hostile work environment, *see Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000), it need not involve actual or threatened physical assault, *see Richardson*, 180 F.3d at 440. The courts' failure to enunciate regimented standards is deliberate and is required to ensure adequate flexibility to promote Title VII's broad remedial pur-

pose. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271 (7th Cir.1991).

█ Plaintiffs have satisfied their burden of alleging that the display of the noose subjectively altered the conditions of their employment. *See* Compl. ¶¶ 19, 21, 25, 49. To substantiate their claim, they must also allege facts that, if proven true, would demonstrate that their perception of the workplace was objectively reasonable. The Second Circuit has noted that the placement of a noose in the workplace can reasonably be perceived as racially hostile conduct. *See Snell v. Suffolk County*, 782 F.2d 1094, 1098 (2d Cir.1986). The question remains, however, whether the conduct in this case was sufficiently pervasive or severe to create a hostile work environment.

Whether the display of the noose constitutes pervasive conduct is a complicated issue. This is the only racist act alleged in the complaint. However, the noose was prominently displayed for at least three days and presumably was viewed by everyone who entered the supervisors' office. Furthermore, it was only removed after one of the plaintiffs complained. The implication of this is that had the plaintiffs remained silent, it would have been on display indefinitely.

As for the severity of the display of a noose, there can be little doubt that such a symbol is significantly more egregious than the utterance of a racist joke. In a case before the Eleventh Circuit, where a plaintiff's state law intentional infliction of emotional distress claim was dismissed, Circuit Judge Fay wrote in dissent:

---

1. Plaintiffs argue that the allegations of retaliatory conduct following their complaints also serve to demonstrate a hostile work environment. And while the court agrees that the same actions may substantiate both a hostile work environment and a retaliation claim, plaintiffs have not alleged that the retaliatory

conduct here could be viewed as racially motivated. They do not allege, in the examples of retaliation contained in the complaint, that they were treated differently because of their membership in a protected class. Rather, they contend that they were treated differently because they complained.

Those of us for whom a particular symbol is just that—a symbol—may have difficulty appreciating· the very real, very significant fear that such symbols inspire in those to whom they are targeted. No less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear.

*Vance v. Southern Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1583 (11th Cir.1993) (Fay, dissenting).

Indeed, the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence. It is impossible to appreciate the impact of the display of a noose without understanding this nation's opprobrious legacy of violence against African–Americans. One study notes that from 1882, the earliest date for reliable statistics, to 1968, 3,446 African–Americans died at the hands of lynch mobs. *See* Robert L. Zangrando, *The NAACP Crusade Against Lynching, 1909–1950* 4 (1980). Obviously, these figures underestimate the actual number of blacks who were the victims of lynchings because such atrocities were underreported, and southern whites frequently attempted to suppress evidence of mob violence for fear of the enactment of a federal anti-lynching law. *See id.*

The effect of such violence on the psyche of African–Americans cannot be exaggerated. Sociologists have explained that "lynching was employed to maintain dominance whenever it suited whites to reaffirm their mastery or blacks challenged or seemed about to test the established contours of their subordination."[2] *Id.* at 9. (This observation is especially relevant to this case where the noose was displayed not by a co-worker, but by a white supervisor.)

Some have opined that the prevalence of violence against blacks in the South was critical to the migration of African–Americans to the North during the first quarter of the twentieth century. *See* Stewart E. Tolnay and E.M. Beck, *Rethinking the Role of Racial Violence in the Great Migration, in Black Exodus: The Great Migration from the American South*, 20 (1991). In the words of one migrant, "After twenty years of seeing my people lynched for any offense from spitting on a sidewalk to stealing a mule, I made up my mind that I would turn the prow of my ship toward part of the country where the people at least made a pretense at being civilized." *Id.* at 27.

The lynchings in this nation's past cannot be relegated to the history books. As one essayist noted: "That is [the] rite of colored male passage: having to drag all those lynchings around with them, around their necks: those are their ancestors." Hilton Als, *GWTW in Without Sanctuary: Lynching Photography in America* 38, 41 (2000) (examining Henry Dumas's short

---

2. Others have also remarked upon the severe psychological harm that lynching has had on the African–American community as a whole:

[L]ynching had a powerful terroristic effect on the target population. Some black southerners witnessed the violence firsthand, but even those who did not could hardly escape awareness of the practice. The use of violence was aimed not just at the individual victim but at the black community generally.... As a result, southern blacks lived with the knowledge that any one of them could be a victim at any time.

Lu-in Wang, *The Complexities of "Hate"*, 60 Ohio St. L.J. 799, 835–36 (1999). *See also* Leon F. Litwack, *Trouble in Mind: Black Southerners in the Age of Jim Crow* 290 (1998) ("Once having settled on lynch justice, mobs were not overly scrupulous about determining the guilt of the black victim. The idea, after all, as one black observer noted, was to make an example, 'knowing full well that one Negro swinging from a tree will serve as well as another to terrorize a community.'")

story, "Ark of Bones"). The hangman's noose remains a potent and threatening symbol for African–Americans, in part because the grim specter of racially motivated violence continues to manifest itself in present day hate crimes.[3] Moreover, persistent inequality in this country resuscitates for modern African–Americans many of the same insecurities felt years ago. It is for this reason that the Civil Rights Act of 1964 was enacted. The courts have a responsibility to be vigilant in enforcing the provisions of this Act to facilitate the eradication of obstacles that currently prevent African–Americans from achieving equality.

█ Racially motivated physical threats and assaults are the most egregious form of workplace harassment. *See Richardson,* 180 F.3d at 440. A review of Second Circuit jurisprudence in this area makes clear that when conduct in the workplace is physically threatening to an individual because of his membership in a protected class, that conduct will almost always create a hostile work environment. *See, e.g.,* *Gregory v. Daly,* 243 F.3d 687, 693 (2d Cir.2001) (holding that hostile work environment claim survived dismissal because of supervisor's "graphic references to sexual assault and women's vulnerability to it, and intimidating physical behavior"); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 70–71 (2d Cir.2000) (reversing summary judgment for defendant in hostile work environment claim in part because one of the racially derogatory comments was physically threatening); *Cruz,* 202 F.3d at 571 (holding that supervisors "physically threatening" behavior brought the "case over the line separating merely offensive or boorish conduct from actionable sexual harassment"); *Tomka,* 66 F.3d at 1305 (noting that "a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability"). The display of a noose would fall within this category of intimidating conduct.[4] The fact that a white supervisor

**3.** One commentator observed:
The impact of bias crimes reaches beyond the harm to the immediate victim or victims of the criminal behavior. There is a more widespread impact on the "target community"—that is, the community that shares the race, religion, or ethnicity of the victim. . . . Members of the target community of a bias crime experience that crime in a manner that has no equivalent in the public response to a parallel crime. . . . Members of the target community of a bias crime perceive that crime as if it were an attack on themselves directly and individually. Consider the burning of a cross on the lawn of an African–American family. . . . Others might associate themselves with the injuries to these families, experience feelings of anger or hurt, and thus sympathize with the victims. Still others might find that these crimes trigger feelings similar to the sense of victimization and attack felt by victims and thus empathize with the victims. The reactions of members of the target community, however, will transcend both empathy and sympathy. Members of the target community experience reactions of actual threat and attack from this very event. Bias crimes spread fear and intimidation beyond the immediate victims and their friends and families to those who share only racial characteristics with the victims.
Frederick M. Lawrence, *The Punishment of Hate: Toward a Normative Theory of Bias-motivated Crimes,* 93 Mich. L.Rev. 320, 345–46 (1994).

**4.** Defendant relies upon a decision from the District of Maryland where the court dismissed a hostile work environment claim based, in part, upon the display of a noose-like object in the workplace. *Settle v. Baltimore County,* 34 F.Supp.2d 969 (D.Md.1999), *aff'd,* 2000 WL 51282, 203 F.3d 820 (2000), 2000 WL 51283, 203 F.3d 822 (2000). That decision is not binding precedent for this court, and to the extent that it conflicts with this decision, the court declines to follow it.

was displaying the noose obviously intensifies the intimidating effect.

Thus, even though there may not have been a large number of isolated remarks or actions, the severity of the conduct at issue, if proven, would be sufficient to establish a hostile work environment. Obviously, in the end, it is the province of a properly instructed jury to decide whether the conduct in this case was severe or pervasive enough to support plaintiffs' hostile work environment claim. Defendant's contention, however, that the display of a noose by a white supervisor in his office could not, as a matter of law, sufficiently "alter the conditions of employment" for an African–American employee is naive and untenable.

## CONCLUSION

Defendant's motion to dismiss plaintiffs' first cause of action is denied.

**IT IS SO ORDERED.**