Nigel KENNEDY, Plaintiff,

v.

J.P. MORGAN CHASE & COMPANY
and Paul Groncki, Defendants.

No. 02 CIV.3994 CM.

United States District Court,
S.D. New York.

July 16, 2004.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Joseph J. Ranni, Law Office of Joseph J. Ranni, Goshen, NY, for Plaintiff.

Philip Andrew Goldstein, Stacey L. Blecher, Stacey L. Davidson Blecher, J.P. Morgan Chase & Co., Legal Dept., New York, NY, for Defendants.

MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Defendant J.P. Morgan Chase & Company ("Defendant" or "J.P. Morgan Chase") seeks summary judgment dismissing Plaintiff Nigel Kennedy's ("Plaintiff" or "Kennedy") claims of discrimination (hostile work environment) and retaliatory discharge pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code, § 8–101, *et seq.*

For the reasons stated below, the Defendant's motion is GRANTED IN PART and DENIED IN PART.

## FACTS

The following facts are taken from the parties' Rule 56 statements. Unless otherwise noted, the facts are either undisputed or interpreted most favorably to Plaintiff.

Plaintiff was employed by Shamrock Computer Network, a vendor that supplied consultants to Defendant. In April 1998, Plaintiff began an assignment as a Certified Computer Engineer Consultant in the Private Financial Services/Private Banking Initiative ("PFS/PBI") department of Defendant's 345 Park Avenue, New York, New York office. Plaintiff remained at that position until his termination on December 16, 2002.

In his capacity as a dedicated desktop support worker, Plaintiff's responsibilities included providing technology support and working with senior levels of management to ensure that technology was functioning properly. Plaintiff's work station was lo-

cated on the fourth floor of the office building and he was supervised first by Mark Danielson ("Danielson") and later by Robert Miranti ("Miranti").

On April 6, 2000, at approximately 5:00 p.m., Plaintiff had just returned to his desk from a meeting. Plaintiff's colleague, James Hoffmann ("Hoffmann") was sitting diagonally across from Plaintiff, and approximately 50 other individuals were located in the immediate vicinity at that time. Paul Groncki ("Groncki"), a Vice President in the PFS/PBI department and an individual to whom Plaintiff sometimes reported, entered the floor dressed in a "robber baron" costume (complete with top hat and cane) and escorted by an unidentified senior bank employee. So attired, Groncki traversed the entire perimeter of the floor from the elevator to Plaintiff's desk. When he reached Plaintiff's desk, Groncki stopped, slammed his cane repeatedly on the floor, and loudly said something like, "What's this? Black people in J.P. Morgan?" Groncki began to laugh after making his statement, and his words drew laughter from others around him.

The fourth floor contained an open floor plan with low trader-type desks. Desks were separated by low partitions and the desks stood approximately three feet away from each other. At the time Groncki made his statement, Plaintiff was on the telephone with another employee, Vincent Fuori ("Fuori").

Hoffmann immediately confronted Groncki's escort and informed her that he believed Groncki's statement was inappropriate. The escort responded, "Oh, don't worry about it, he knows Nigel, it's no big deal." Plaintiff did not immediately confront Groncki about his comments. Groncki walked away from Plaintiff's desk, as flamboyantly as he had arrived, with hands raised and cane waving.

The following day, April 7, 2000, Groncki, dressed in regular business attire, approached Plaintiff and stated, "I hope you're not going to talk to Morgan about the comments I made." Plaintiff responded that he "wasn't sure it was [Groncki]" and walked away because he felt uncomfortable in Groncki's presence.

Approximately one day later, Plaintiff contacted his supervisors, Danielson and Miranti, because he felt that management should be made aware of Groncki's conduct. In this meeting, Plaintiff did not request that any specific action be taken against Groncki and expressly stated that any disciplinary action was up to the discretion of the bank. Plaintiff did not ask Shamrock for reassignment to another location.

Danielson communicated details of the incident to Barbara Hart ("Hart") of the Human Resources department. Plaintiff subsequently met with Hart and expressed concern about possible retaliation as a result of coming forward with his complaint. Hart assured Plaintiff that Groncki's conduct would not be tolerated, but stated that she would be unable to reveal the terms of any disciplinary action. Plaintiff informed Hart that he wished to have no further contact with Groncki outside of what was required for the performance of his job. Hart advised Plaintiff that the Human Resources department would ensure that Groncki did not have any further contact with Plaintiff.

After the meeting, Hart informed her supervisor, Lynn Avitabile ("Avitabile") about what had taken place. Avitabile then called Debbie Collins, Esq. in the Employee Relations Department and Susan Restler, Groncki's supervisor, to keep them apprised of the situation.

Over the next few days, Groncki made several attempts to contact Plaintiff by stopping him in the hallway and leaving a

note on Plaintiff's desk. Plaintiff rebuffed Groncki's overtures and gave the unopened note to Danielson and Hart. At that time, Plaintiff reiterated that he did not wish to have any contact with Groncki. Danielson and Hart advised Plaintiff that he no longer had to support Groncki individually, although he would still be charged with supporting Groncki's business area. Plaintiff also alleges that he was encouraged by Danielson, acting under Restler's direction, to meet with Groncki in an attempt to make amends. Such unwanted overtures form the basis of Plaintiff's hostile work environment claim.

There is some disagreement as to the extent that Plaintiff was approached by his supervisors for the purpose of encouraging him to accept an apology from Groncki. Restler acknowledges that she initially tried to set up a meeting among herself, Danielson, Groncki, and Plaintiff to try and resolve the issue. When Plaintiff indicated that he had no interest in attending such a meeting, Restler encouraged Groncki to write the letter of apology. Avitabile testified that when Groncki expressed a desire to personally apologize to Plaintiff she informed him that Plaintiff had no desire to receive an apology and that he was not to contact him. Aside from Restler's single attempt to set up the meeting and Groncki's delivery of the letter, there is no evidence that Plaintiff was otherwise pressured to meet with Groncki or accept an apology. In fact, Plaintiff's only other allegation is that he encountered Groncki in the hallway on several occasions and Groncki greeted him by saying "Hello."

As a result of the April 6, 2000 incident, Groncki was placed on final formal written warning by Restler and Avitabile. Although Groncki testified that he never personally received a copy of the written warning, he acknowledged that a member of the Human Resources Department did inform him that a strong letter had been placed in his personnel file and that even the slightest infraction in the future would result in his immediate termination. In addition to the formal written warning, Avitabile testified that Groncki was directed to attend sensitivity training although she could not confirm that he actually attended the session.

On or about January 29, 2001, Plaintiff executed, had notarized and duly filed a "Charge of Discrimination" with the Equal Employment Opportunity Commission ("EEOC") against Defendant J.P. Morgan Chase alleging race, color and/or national origin discrimination and retaliation. On or about February 28, 2002, the EEOC issued Plaintiff a Notice of Right To Sue.

Plaintiff filed a complaint in the United States District Court for the Southern District of New York on May 24, 2002 pursuant to Title VII, the NYHRL and the NYCHRL alleging discrimination, retaliation and that he was subject to a hostile work environment based on his race, color and/or national origin. It was not clear to the Court in 2002, and it is not clear now, what actions committed prior to the filing of the lawsuit were allegedly retaliatory. The only action specifically mentioned in the complaint was Groncki's behavior towards the Plaintiff on April 6, 2000. Plaintiff made vague references to the existence of a hostile work environment and discriminatory hiring and promotion practices at J.P. Morgan Chase even before the April 6, 2000 incident, but did not provide any facts to support these allegations.

Plaintiff's assignment at J.P. Morgan Chase ended on December 20, 2002. William Goodridge ("Goodridge") managed the Business Technology Infrastructure Management ("BTIM") group when Plaintiff began his assignment at Defendant's office in April 1998. At that time, Plaintiff was one of eleven employees assigned to Goodridge's department. Goodridge testi-

fied that on August 1, 2002 he was informed that some members of his group would be terminated as part of a reduction-in-force. As a result of this reduction-in-force, six of the eleven employees or consultants in the BTIM group, including Plaintiff, were terminated over the next several months. Regular employees were selected for termination based upon their performance on internal human resources evaluations. Consultants were selected for termination pursuant to guidelines set forth in a new operating model and the BTIM Operation Roles and Responsibilities manual. Many of the functions formerly performed by BTIM were transferred to a new group within J.P. Morgan Chase called Enterprise Technology Services ("ETS").

At the time of the reduction-in-force several employees were evaluated to see whether positions existed in the ETS group for which they were qualified. Goodridge testified that this evaluation process was limited to full-time J.P. Morgan Chase employees and that consultants did not automatically receive the same review. Although candidates did not have to meet any specific criteria to be recommended for employment in the ETS group, the primary focus was on transferring high performing employees who would fit in with the ETS culture.

In October 2002, Goodridge recommended Plaintiff for a position in the ETS group, but was advised by ETS personnel that they were not interested in hiring Plaintiff. Goodridge did not seek an explanation from ETS personnel regarding this decision. Because there was no interest in hiring Plaintiff, Goodridge designated Plaintiff for termination in November 2002. Goodridge testified that, at the time he designated Plaintiff for termination., he was unaware of any details about the April 6, 2000 incident involving Plaintiff and Groncki.

After submitting his report designating Plaintiff and other employees for termination, Goodridge was contacted by Shannon Terry ("Terry") who advised him that all of his designations were accepted except for Plaintiff. Terry requested that Goodridge resubmit his report in late November 2002 and provide greater detail regarding the exact reason for Plaintiff's termination. At the time of Terry's request, Goodridge testified that he had heard vague rumors about the April 6, 2000 incident but that he had no direct knowledge of Plaintiff's lawsuit against J.P. Morgan Chase. Goodridge questioned Terry about her "unusual" request, but was informed that the matter was confidential and that no other information could be disclosed.

In response to Terry's request, Goodridge resubmitted his report in November of 2000. Included in the revised report was a statement that Plaintiff "does not have the broad knowledge of servers, networks, databases and other core infrastructure required to perform the current technology oriented BTIM responsibilities." Goodridge based this assessment on a description of Plaintiff's abilities that he received from Plaintiff's immediate supervisor, Anthony Casalino, as well as from his own evaluation of Plaintiff's skills in comparison to other employees. Eventually someone at J.P. Morgan Chase concluded that Plaintiff could be fired. He was so notified on December 16, 2002.

Plaintiff served Defendant with an amended complaint two days later. The sole amendment to the original complaint was a statement detailing that his employment had been terminated.

Since Plaintiff's termination, several of the tasks that Plaintiff formerly performed are now handled by members of the ETS group. Other tasks were not transferred

to the ETS group and have been discontinued entirely.

## DISCUSSION

### I.  Relevant Legal Standards

A party is entitled to summary judgment when there is no "genuine issue as to any material fact" and the undisputed facts warrant judgment for the party as a matter of law.  Fed.R.Civ.P. 26(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Only factual disputes that might affect the outcome of the suit will preclude summary judgment.  *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.  In considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Summary judgment is appropriate if the opposing party fails to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In order to defeat a motion for summary judgment, the opposing party cannot rely on mere allegations or denials in its pleading, but must present affirmative evidence showing that there is a genuine issue for trial. *See Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505.

To survive a motion for summary judgment the party resisting the motion must do more than present evidence that is "merely colorable," "conclusory" or "speculative." *Anderson,* 477 U.S. 242, 249–50, 106 S.Ct. 2505; *see also Stalter v. Bd. of Coop. Educ. Servs. of Rockland County,* 235 F.Supp.2d 323, 328 (S.D.N.Y.2002) (quoting *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (party opposing summary judgment may "not rely on conclusory allegations or unsubstantiated speculation.")). The non-movant must present "concrete evidence from which a reasonable juror could return a verdict in [her] favor" and cannot rest on mere allegations or denials of facts asserted by the movant. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see also Shabazz v. Montefiore Med. Ctr.,* No. 99 Civ. 4311(BSJ), 2002 WL 31132886, at *1 (S.D.N.Y. Sept.26, 2002) ("It is not enough for the party opposing summary judgment to assert a conclusion without supplying any supporting argument or facts").  Thus, even in discrimination cases, summary judgment "is still fully appropriate, indeed mandated, when the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61–62 (2d Cir. 1998).

The burden and allocation of proof in employment discrimination cases is well established.  First, "the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).  Second, if the plaintiff succeeds in establishing the prima facie case, "the burden shifts to the defendant (to articulate some legitimate, nondiscriminatory reason for the [adverse employment decision] )." *Id.* at 253, 101 S.Ct. 1089. Third, if the defendant satisfies this burden, the plaintiff may defeat summary judgment only upon a showing that defendant's proffered reason was false and that discrimination was the true reason for defendant's actions. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).  The ultimate burden of persuading the trier of fact remains at all times with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

## II. Rule 56.1 Statement

Defendant argues that Plaintiff's Amended Complaint should be automatically dismissed for failure to comply with Rule 56.1. The Purpose of Rule 56.1 "is to assist the Court in understanding the scope of the summary judgment motion by highlighting those facts which the parties contend are in dispute." *Archie Comic Publ'ns, Inc. v. De Carlo,* 258 F.Supp.2d 315, 317 (S.D.N.Y.2003) (citing *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP), 1999 WL 459813, at *1 n. 3 (S.D.N.Y. June 29, 1999)).

> "A proper Rule 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to the movant's 56.1 statement and must cite admissible evidence in support of the non-movant's contention that there is admissible evidence creating a genuine issue for trial. While it is permissible for the non-movant to provide a separate statement, apart from this paragraph-by-paragraph response, in which it lists other facts it claims to be in dispute, this separate statement is not a substitute for the paragraph-by-paragraph response. The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from this separate statement the pieces of evidence which would support the contentions of the non-movant asserted in its paragraph-by-paragraph response without citation."

*Archie Comic Publ'ns, Inc. v. De Carlo,* 258 F.Supp.2d 315, 317–18 (S.D.N.Y.2003) (citing *Rodriquez v. Schneider,* No. 95 Civ. 4083(RPP), 1999 WL 459813, at *1 n. 3 (S.D.N.Y. June 29, 1999)).

■ While Plaintiff's Rule 56.1 statement does not in any way appear to be a paragraph-by-paragraph rebuttal to Defendant Rule 56.1 statement, upon reading Plaintiff's statement it is clear that there are disputed issues of material fact. Therefore, Plaintiff's Rule 56.1 Statement had complied with the spirit of the rule and his Amended Complaint will not be automatically dismissed.

Defendant's argument that Plaintiff's Rule 56.1 statement includes several paragraphs that fail to cite to the record is quibbling. Plaintiff has submitted a fifty-six page Rule 56.1 statement. Virtually all of Plaintiff's statements cite to the record and he has, therefore, substantially complied with Rule 56.1's requirements.

## III. The Claims Asserted in the Original Complaint are Dismissed

### A. *Hostile Work Environment*

■ In order to establish a claim of hostile work environment, Plaintiff must demonstrate that his workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams v. New York City Housing Authority,* 154 F.Supp.2d 820, 822 (S.D.N.Y.2001) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Furthermore, there must be a specific basis for imputing the conduct that created the hostile work environment to the employer. *Williams,* 154 F.Supp.2d 820 (quoting *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997)). It must be shown that the workplace was both subjectively and objectively hostile. *Williams,* 154 F.Supp.2d 820, 822 (S.D.N.Y.2001) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Although there are no specific criteria for evaluating the existence of a hostile work environment, the United States Supreme Court has identified a variety of considerations that should be taken into account in determining the severity and pervasiveness of questioned conduct. The list includes "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Williams,* 154 F.Supp.2d 820, 822 (S.D.N.Y.2001) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

In the present case, Plaintiff has alleged a single incident of improper conduct by Groncki. While the Second Circuit has held that, "there [is no] specific minimum number of incidents below which a plaintiff fails as a matter of law to state a claim," *Williams,* 154 F.Supp.2d 820, 823 (S.D.N.Y.2001) (quoting *Richardson v. New York State Dep't of Corr. Service,* 180 F.3d 426, 439 (2d Cir.1999)), it has also ruled that a single incident will not support a claim of hostile work environment unless the "single incident is extraordinarily severe." *Williams,* 154 F.Supp.2d 820, 822 (S.D.N.Y.2001) (quoting *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000)). *See, e.g. Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir.1995) (single incident where plaintiff was raped by three coworkers "sufficiently alter[ed] the conditions of the victim's employment and clearly create[d] an abusive work environment for purposes of Title VII liability.").

■ The single incident of misconduct Plaintiff alleges against Groncki is not sufficiently severe to support Plaintiff's hostile work environment claim. Groncki's conduct on that afternoon was most assuredly offensive. It did not, however, indicate that the workplace was "permeated with discriminatory intimidation, ridicule and insult."

■■ In any event, J.P. Morgan Chase cannot be held liable for Groncki's boorish conduct, because it took appropriate steps to alleviate the workplace tension and ensure that such conduct was not repeated.

Hostile work environments are generally imputed to the employer unless the employer can demonstrate that it took appropriate action to remedy the situation. *See Wiley v. Citibank, N.A.,* 98 Civ. 1139(DABRLE), 2001 WL 357322, at *5 (S.D.N.Y. Mar.31, 2001), 2001 U.S. Dist. LEXIS 4099 (Batts, J.) (citing *Kracunas v. Iona College,* 119 F.3d 80, 89 (2d Cir. 1997)). Testimony of Hart, Restler, and Avitabile makes it clear that Defendant immediately reprimanded Groncki and informed him that similar conduct in the future would result in immediate dismissal. Furthermore, Defendant made accommodations so that Plaintiff would no longer be required to provide Groncki with technical support. Defendant's failure to tally the number of employees offended by Groncki's behavior is irrelevant. It is an employer's systematic tolerance of continued offensive behavior, not the headcount of possible victims from a single incident, that is most telling in hostile work environment claims. Plaintiff has not alleged sufficient facts to meet this very high burden.

■ Finally, Groncki's efforts to contact Plaintiff after the incident, while unwelcome, also did not create a hostile work environment. Groncki testified that, feeling terrible about the incident, he approached Plaintiff to apologize a few times in the days following the incident. Perhaps not realizing the extent of Plaintiff's discomfort, Restler and Danielson initially tried to facilitate a meeting between Plaintiff and Groncki and recommended that Groncki write an apology letter. There is absolutely no testimony, however, that any of these attempts persisted for more than a brief period. In fact, when it became clear that Plaintiff had no interest in accepting an apology, Avitabile instructed Groncki not to contact Plaintiff again. Plaintiff was also informed that he no longer had to provide Groncki with technical

support. At worst, Groncki, Danielson, and some HR personnel were overzealous in their efforts to resolve the situation. That is not actionable.

B. *Race Discrimination and Retaliation*

■ Plaintiff's allegation that J.P. Morgan Chase implicitly fostered a hostile work environment by tolerating offensive behavior is equally unsubstantiated. Among the behavior that Plaintiff cites in support of this claim is an incident where Groncki purportedly threw a computer keyboard across his desk in frustration while dealing with a minority technology support employee. Plaintiff also alleges that, during the course of his employment, employees used racial slurs in casual conversation around the office. Plaintiff's testimony indicates that he never reported any of this conduct to his supervisors. Plaintiff's colleague, Vincent Fuori, testified that the use of racial slurs was "infrequent" and carried out in personal conversations among employees that would not have been heard by supervisors.

Once again, therefore, while the described conduct is certainly offensive, such isolated and infrequent incidents do indicate a workplace permeated by "discriminatory intimidation, ridicule and insult." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). *See also Stembridge v. City of New York,* 88 F.Supp.2d 276, 286 (S.D.N.Y.2000) (finding use of epithets "uppity nigger" and "boy" on two isolated occasions over the course of three years not sufficient to create hostile work environment).

■ Even recognizing the offensiveness of such comments, J.P. Morgan Chase cannot be held liable for such conduct because management was never made aware of them. Employers have an affirmative defense to hostile work environment claims

brought by an employee when there is a formal grievance policy in place of which the employee had knowledge but failed to avail himself. *Pa. State Police v. Suders,* —— U.S. ——, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). Although Plaintiff alleges that he was not aware of the "exact details" of J.P. Morgan Chase's grievance policy, there is no disputed issue of fact on this score. The undisputed testimony indicates that Plaintiff received a copy of "A Guide to Working at J.P. Morgan" during his orientation at the company. In fact, Plaintiff introduced a copy of this manual as an exhibit to the papers he filed in opposition to this motion. (Plf.'s Ex. 1)

On page 19, under the heading "Policy Against Harassment," the Guide states, "[J.P. Morgan] will not tolerate insulting, degrading, or exploitative treatment, whether verbal, nonverbal, or physical." On page 20, under the heading "Reporting Harassment," the Guide states that employees who witness or suffer the effects of workplace harassment, "must promptly notify his or her manager, any HR liaison, a member of Employment Relations, or the head of Human Resources."

Plaintiff clearly had several individuals to whom he could have reported these alleged acts of harassment. That Plaintiff chose to ignore every avenue open to him was his own error, and will not now subject J.P. Morgan Chase to liability for incidents of which they had no knowledge.

Accordingly then, Defendant's motion for summary judgment is GRANTED with respect to the claims asserted in the May complaint.

IV. Defendant's Motion for Summary Judgment on the Retaliatory Discharge Claim is Denied

Plaintiff's original claim of retaliation (which I assume was retaliation for the filing of his complaint with HR after the

Groncki incident) is wholly unsupported. Indeed, Plaintiff has not even identified in what way J.P. Morgan Chase retaliated against him after he complained to HR. He documents no instance in which he suffered a diminution in responsibility or was punitively assigned work. His compensation did not diminish. He has no claim.

However, Plaintiff was discharged after he filed this action, in circumstances that could give rise to an inference of retaliation. Defendant's motion for summary judgment on that aspect of Plaintiff's claim is denied.

■ In an employment discrimination case, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case of discriminatory discharge, the plaintiff must show that (1) he belongs to a protected class; (2) that he was performing his duties satisfactorily; (3) that he was discharged; and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

■ Through his own testimony and that of his supervisors, Plaintiff has clearly established the first three prongs of the *Chambers* test. And genuine issues of material fact remain with respect to the fourth prong that preclude summary judgment. Plaintiff was fired only months after he brought this lawsuit. He was fired despite the fact that his supervisor recommended that he be retained by the new group after the reduction in force. That is enough to get Plaintiff's retaliatory discharge claim to trial.

## CONCLUSION

For the above stated reasons, Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's hostile work environment claim, and DENIED with respect to Plaintiff's retaliatory discharge claim.