[Cite as *Croley v. JDM Servs., L.L.C.*, 2025-Ohio-4762.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Jhalil Croley, | : | |
| Plaintiff-Appellant, | : | No. 23AP-544 |
| | | (C.P.C. No. 20CV-6746) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| JDM Services, LLC, d.b.a. Frank Road Recycling Solutions et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on October 16, 2025

**On brief:** *Walton + Brown, LLP*, *Sean L. Walton*, and *Chanda L. Brown*, for appellant.
**Argued:** *Chanda L. Brown.*

**On brief:** *Amundsen Davis*, *Natalie P. Bryans*, *Steven E. Miller*, and *Christopher R. Green*, for appellees.
**Argued:** *Steven E. Miller.*

APPEAL from Franklin County Court of Common Pleas

MENTEL, J.

## I. INTRODUCTION

{¶ 1} Plaintiff-appellant, Jhalil Croley, appeals from an August 10, 2023 decision and entry granting the motion for summary judgment of defendants-appellees, JDM Services, LLC, d.b.a. Frank Road Recycling Solutions ("Frank Road Recycling"), and Joseph Loewendick. For the reasons that follow, we reverse.

## II. FACTS AND PROCEDURAL HISTORY

{¶ 2} Croley, an African American male, is a certified heavy equipment operator. Croley received his certification from Performance Training Solution in 2019. (Croley Dep. at 8-9, 20; Compl. at ¶ 2; Answer at ¶ 2.) In January 2020, Croley filed a job application

through Reliable Staffing, a temporary employment agency, as a heavy equipment operator at Frank Road Recycling. (Croley Dep. at 15-17.) On January 10, 2020, Ken Pennington, the general manager of Frank Road Recycling, interviewed Croley regarding the position. (Croley Dep. at 17-20; Loewendick Dep. at 5-7.) During the interview, Croley was asked to demonstrate that he could operate the equipment. Croley successfully operated an excavator for approximately one hour and was offered the job. (Croley Dep. at 19-20.) Croley accepted the job, completed a drug screen, and left for the day. (Croley Dep. at 22-24.)

{¶ 3} On January 13, 2020, Croley reported to Frank Road Recycling for his first day of work. (Croley Dep. at 26.) Croley and other employees were driven by pickup truck to the landfill. (Croley Dep. at 28-30, 33.) Croley operated an excavator for eight hours without incident. (Croley Dep. at 33.)

{¶ 4} On January 14, 2020, Croley clocked in at 8:15 a.m. and went with the other employees by pickup truck to work in the landfill. (Croley Dep. at 34.) Pennington, traveling in the opposite direction, pulled alongside the pickup truck and instructed the driver to "[m]ake sure the new operator, Jhalil, gets on the compactor." (Croley Dep. at 34.) Upon arrival at the landfill, Austin Moore, assistant manager, directed a compactor operator, Alex Covix, to give Croley instructions on how to check fluids as well as provide a general rundown of the machine. (Croley Dep. at 34-35; Loewendick Dep. at 7.) After training with Covix, Moore drove Croley across the landfill in the compactor to provide him some additional instruction on how to operate the machine. (Croley Dep. at 34-36.) Croley, finding the ride was becoming bumpy, searched for something to hold onto for stability. (Croley Dep. at 35, 40.) When Croley grabbed a rope that was hung on his left side, he found the rope was not stable nearly causing him to fall from the compactor. (Croley Dep. at 35; 117.) According to Croley, he was focused on the machine and did not pay attention to the rope or think anything about it at the time. (Croley Dep. at 35, 39.)

{¶ 5} After some additional instruction, Moore left Croley to operate the compactor. (Croley Dep. at 35.) According to Croley, he noticed that the rope was wrapped around the rearview mirror. (Croley Dep. at 117.) After a few minutes, Croley observed that the rope was tied like a noose, which caused him to become "nervous and scared." (Croley Dep. at 35-36, 64.) Croley took a picture of the noose noting that it had no dirt and was

"freshly-tied." (Croley Dep. at 46.) Croley left the noose in the compactor and ate lunch alone in his vehicle. (Croley Dep. at 48, 50.) At the end of the day, Croley took the noose from the compactor and left it outside the door of the employee trailer. (Croley Dep. at 50-52.) Croley cried in his car before proceeding home for the day. (Croley Dep. at 53.)

{¶ 6} That night, Croley contacted his career advisor at Jewish Family Services for Family Forward, Fred Points, to report finding the noose. (Croley Dep. at 55-56, 59-60.) Upon Points' suggestion, Croley sent an image of the noose to an employee at Reliable Staffing on the morning of January 15, 2020. (Croley Dep. at 55, 60-62.) The employee at Reliable Staffing indicated that they would contact Pennington regarding the incident. (Croley Dep. at 60-61.)

{¶ 7} Croley reported for work on January 15, 2020. Within 15 minutes of his arrival, Pennington told Croley that he would investigate the matter and figure out who hung the noose in the compactor. (Croley Dep. at 63-64.) When Pennington asked where the noose was located, Croley stated that it was left outside the employee trailer. (Croley Dep. at 65.) After his lunch break, Croley noticed the noose was still outside the trailer. Croley spoke with Points again, who advised him to pick up the rope and preserve it in case he had to give it to a lawyer to investigate the incident. (Croley Dep. at 79.) Croley picked up the noose and put it in his vehicle. (Croley Dep. at 68-69.) At the end of the shift, Pennington asked if he could see the noose. (Croley Dep. at 72-73.) Croley retrieved the noose from his vehicle and provided it to Pennington. When Pennington asked to keep the noose, Croley refused. (Croley Dep. at 72-73.) Croley explained that he did not trust anyone. (Croley Dep. at 73.) Croley testified that he was "never comfortable" again at work after the noose incident. (Croley Dep. at 98.)

{¶ 8} On January 20, 2020, Croley was assigned to operate an excavator picking up scrap metal on the side of a "cliff" in the landfill. (Croley Dep. at 83, 105.) On January 21, 2020, Croley was assigned to operate the excavator in an open area of the landfill while another employee went to lunch. (Croley Dep. at 83-85.) According to Croley, the glass on the cab of the excavator shattered while he was operating the machine. (Croley Dep. at 81.) Croley believed that the reason the glass shattered was "[j]ust as intentional as the noose." (Croley Dep. at 99.) Croley alleged the glass shattered from a BB or pellet gun. (Croley Dep. at 81-82, 86, 90-91.) Croley explained that before the excavator was parked, "the glass

was still intact, it was just a small hole, but the whole glass was shattered." (Croley Dep. at 89.) Immediately after the incident, Croley noticed that Pennington's truck was parked at the top of a hill. (Croley Dep. at 81-82.) Croley cleaned up the broken glass and worked for the rest of the day driving a rock truck. (Croley Dep. at 82, 90-91.)

{¶ 9} On January 22, 2020, Croley was instructed not to come into work. (Croley Dep. at 76-77, 91-92.) A meeting was later scheduled between Croley and Loewendick, a co-owner of Frank Road Recycling, for the following day. (Croley Dep. at 92; Loewendick Dep. at 5-6.) On January 23, 2020, Croley worked on an excavator from 8:15 to 9:28 a.m. (Croley Dep. at 93.) Croley then met with Loewendick, Pennington, Steven Miller, and Theresa Keller from Reliable Staffing. (Croley Dep. at 93; Loewendick Dep. at 14-15.) Croley was informed that Frank Road Recycling would not tolerate any racial discrimination, and that they were investigating the incident. (Croley Dep. at 94; Loewendick Dep. at 16.) Loewendick requested that Croley bring the noose to work the next day, to which Croley agreed. (Croley Dep. at 94; Loewendick Dep. at 17.) Croley returned to work for the remainder of the day. (Croley Dep. at 97-98.)

{¶ 10} On January 24, 2020, Croley reported for work. During his shift, Croley was reprimanded for allegedly operating the compactor in a higher gear. (Croley Dep. at 119.) Croley disputed the basis for the reprimand and was not aware of any written disciplinary report at the time. (Croley Dep. at 118-119.) While Croley operated the compactor, Loewendick approached and asked if he had brought the rope. (Croley Dep. at 94-95; Loewendick Dep. at 17-18.) Croley stated that the noose was in his vehicle. (Croley Dep. at 94-95; Loewendick Dep. at 17-18.) Moore then drove Croley back to his vehicle to retrieve the noose. (Croley Dep. at 95.) Croley allowed Loewendick to see the noose but refused to turn it over to Frank Road Recycling. (Croley Dep. at 95; Loewendick Dep. at 18.) Loewendick then offered to cut a piece off the end of the rope to compare it with other rope on the premises to identify where it came from, but Croley refused. (Croley Dep. at 95-96; Loewendick Dep. at 18.) According to Loewendick, Croley stated, "I'm not giving it to you, I don't trust you." (Loewendick Dep. at 18.) Loewendick acknowledged that he did not offer to store the noose in a "safe" location where "everyone could feel comfortable." (Loewendick at 23.) As a result, Loewendick terminated Croley for insubordination and impeding the investigation into the noose incident. (Croley Dep. at 95-96; Loewendick

Dep. at 18-19.) Loewendick recalled that Croley was not disrespectful and did not threaten him as he left. (Loewendick Dep. at 19.)

{¶ 11} After terminating Croley, Loewendick called the Columbus Police Department to file a criminal charge against Croley for allegedly making threatening statements to another employee. (Loewendick Dep. at 27-28.) However, Loewendick admitted that the employee told the police that he never felt threatened at Frank Road Recycling. (Loewendick Dep. at 29.) Law enforcement took no legal action based on Loewendick's complaint. (Loewendick Dep. at 31.) According to Loewendick, he called the police because "[i]t was [his] duty to keep a safe workplace." (Loewendick Dep. at 30.) Loewendick conceded that he never called the police regarding the noose incident because they were "doing an investigation." (Loewendick Dep. at 30.)

{¶ 12} On October 14, 2020, Croley initiated this action against Frank Road Recycling and Loewendick raising the following causes of action: hostile work environment (Count One); race discrimination (Count Two); and retaliation (Count Three). The appellees filed an answer on November 19, 2020. On January 18, 2022, the appellees filed a motion for summary judgment as to all three claims. On March 1, 2022, Croley filed a memorandum in opposition arguing there was a genuine issue of material fact regarding the hostile work environment and retaliation causes of action. A reply brief was filed on March 14, 2022.

{¶ 13} On August 10, 2023, the trial court issued a written decision granting the appellees' motion for summary judgment. Specifically, the trial court concluded that the alleged acts were not severe or pervasive enough to create a hostile work environment. The trial court next found that there was no genuine issue of material fact as to the race discrimination claim. The trial court explained that even if Croley could demonstrate a prima facie case of race discrimination, the appellees satisfied their burden by offering legitimate, nondiscriminatory reasons for termination based on Croley's purported misconduct, insubordination, and interference with the investigation into the alleged conduct. Finally, the trial court found that Croley could not succeed in his retaliation claim as termination based on his refusal to turn over the noose to the appellees, or allow them to cut a piece of it for use in the investigation, was not protected activity.

{¶ 14} Croley filed a timely appeal.

## III. ASSIGNMENT OF ERROR

{¶ 15} Croley assigns the following as trial court error:

> The trial court erred when it granted the motion for summary judgment filed by Frank Road Recycling.

## IV. STANDARD OF REVIEW

{¶ 16} Pursuant to Civ.R. 56(C), the party moving for summary judgment bears the initial burden of demonstrating for the trial court the grounds for the motion and identifying those portions of the record showing the absence of a genuine issue of material fact. *Donaldson v. Ohio Dept. of Rehab. & Corr.*, 2024-Ohio-6110, ¶ 15 (10th Dist.), citing *Price v. Evans Auto Repair, Inc.*, 2024-Ohio-5108, ¶ 12 (10th Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). "However, the moving party cannot discharge its initial burden under this rule with a conclusory assertion that the non-moving party has no evidence to prove its case; the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) affirmatively demonstrating that the non-moving party has no evidence to support the non-moving party's claims." (Citation omitted.) *Meredith v. ARC Indus., Inc. of Franklin Cty.*, 2024-Ohio-4466, ¶ 20 (10th Dist.). If the moving party fails to satisfy its initial burden, the trial court must deny the motion for summary judgment. *Price* at ¶ 12. If the moving party has met its initial burden under Civ.R. 56(C), then the nonmoving party has a reciprocal burden to respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial. *Commonwealth Cas. Ins. Co. v. Small*, 2025-Ohio-184, ¶ 13 (10th Dist.). In the summary judgment context, a "material" fact is one that could affect the outcome of the case under the applicable substantive law. *Plough v. Nationwide Children's Hosp.*, 2024-Ohio-5620, ¶ 30, citing *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993). A genuine dispute of fact exists if the evidence presents sufficient disagreement between the parties' positions. *Id.*

{¶ 17} Summary judgment is appropriate when the moving party demonstrates "(1) no genuine issue of material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Small* at ¶ 12, citing Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997). "Because summary judgment is a procedural device used to

terminate litigation, it must be awarded with caution." *Id.* at ¶ 13, citing *Davis v. Loopco Industries, Inc.*, 66 Ohio St.3d 64, 66 (1993), citing *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-59 (1992). When considering a motion for summary judgment, a reviewing court must resolve all doubts and construe the evidence in a light most favorable to the nonmoving party. *Id.*, citing *Davis* at 64, 66, citing *Murphy* at 358-359.

{¶ 18} We review the trial court's grant of summary judgment under a de novo standard of review. *Premiere Radio Networks, Inc.*, 2019-Ohio-4015, ¶ 6 (10th Dist.), citing *Capella III, L.L.C. v. Wilcox*, 2010-Ohio-4746, ¶ 16 (10th Dist.). "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." *Id.* at ¶ 6.

## V. LEGAL ANALYSIS

{¶ 19} In his sole assignment of error, Croley argues that the trial court erred by granting the appellees' motion for summary judgment. Specifically, Croley argues that there is a reasonable dispute of fact as to his hostile work environment and retaliation claims that make summary judgment inappropriate. For the following reasons, we agree.

### A. Hostile Work Environment

{¶ 20} A hostile work environment is a workplace that is "permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]' " (Citations omitted.) *Chapa v. Genpack, L.L.C.*, 2014-Ohio-897, ¶ 54 (10th Dist.), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1996). To succeed on a cause of action for a hostile work environment created by racial harassment, the plaintiff must demonstrate: "(1) the employee is a member of a protected class, (2) the harassment was unwelcome, (3) the harassment was based on race, (4) the harassment had the effect or purpose of unreasonably interfering with the employee's work performance or of creating an intimidating, hostile, or offensive work environment, and (5) employer liability through respondeat superior." (Citation omitted.) *Hinton v. Ohio Dept. of Youth Servs.*, 2022-Ohio-4783, ¶ 33 (10th Dist.).

### 1. Noose Incident

{¶ 21} Croley first offers the noose incident in support of his hostile work environment claim. As alleged, on January 14, 2020, Croley was expressly directed by

Pennington, the general manager of Frank Road Recycling, to operate the compactor. After some training, Croley discovered that a noose was hung from the rearview mirror of the compactor.

{¶ 22} The first prong is easily satisfied as Croley, an African American male, is a member of a protected class. It is also apparent from the record that Croley has satisfied the second and third prongs of the analysis. The noose, and the threat it represents, must not be lost in this discussion. "Those of us for whom a particular symbol is just that -- a symbol -- may have difficulty appreciating the very real, very significant fear that such symbols inspire in those to whom they are targeted. No less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear." *Vance v. S. Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1583 (11th Cir. 1993) (Fay, J., dissenting). The noose is a symbol of this nation's violent legacy against African Americans and brings them " 'the grim specter of racially motivated violence' that continues today." *Little v. NBC*, 210 F.Supp.2d 330, 390 (S.D.N.Y. 2002), quoting *Williams v. New York City Hous. Auth.*, 154 F.Supp.2d 820, 824 (S.D.N.Y 2001); *see also Johnson v. Potter*, 177 F.Supp.2d 961, 965 (D.C.Minn. 2001) (writing that the image of a noose is "deeply a part of this country's collective consciousness and history, any explanation of how one could infer a racial motive appears quite unnecessary"). The noose is "among the most repugnant of all racist symbols, because it is *itself* an instrument of violence." (Emphasis added.) *Williams* at 824.

{¶ 23} Historically, the noose is forever "linked to lynching, the Ku Klux Klan ("KKK"), and the murdering of thousands of African-Americans." Tess Godhardt, *Reconciling the History of the Hangman's Noose and its Severity Within Hostile Work Environment Claims*, 51 J.Marshall L.Rev. 137, 137 (2017). While reporting on lynching was not prevalent until the late 1870s, recent studies have determined that 3,959 African Americans were lynched within the United States from 1877 to 1950. (Citation omitted.) *Id.* at 144.[1] "The effect of such violence on the psyche of African-Americans cannot be exaggerated. Sociologists have explained that lynching was employed to maintain

---

[1] Though it should be noted that any such estimates of lynching are understandably underreported, other articles have provided similar statistical figures. *See, e.g.*, Tyiarah Adewakun, *Hanging on to Justice: Why the Display of a Hangman's Noose in the Workplace Gives Rise to a Racially Hostile Work Environment*, 20 Rutgers Race & L.Rev. 13, 15-16 (2018) (writing that the NAACP has reported that from 1882-1968, at least 3,446 African Americans were lynched).

dominance whenever it suited whites to reaffirm their mastery or blacks challenged or seemed about to test the established contours of their subordination." (Internal quotation marks deleted and citations omitted.) *Williams* at 824. As recent as 2007, "[t]he National Association for the Advancement of Colored People declared a State of Emergency in which they reported that forty-three noose hangings had occurred since early 2006." Godhardt at 144.

{¶ 24} The dissent contends that "[o]ther than the noose, there are no credible allegations of any race-based comments or other activity involving race. The noose is not connected to any threatening intent or racial animus by Frank Road Recycling." (Dissent at ¶ 116.) Given the well-known racist and violent history of lynching in this country, the dissent's claim strains credulity. Even today, the noose remains one of the most visceral symbols against African Americans based on its association with the practice of lynching. The persistent inequality in this country resuscitates for modern African Americans these same fears from years ago. Jeannine Bell, *The Hangman's Noose and the Lynch Mob: Hate Speech, Hate Crime and Jena 6*, 44 Harv. C.R.-C.L. L.Rev. 329, 345 (2009). Courts have noted that "[t]he noose in [the workplace] context is a symbol not just of racial discrimination or of disapproval, but of terror." *Vance* at 1583 (Fay, J., dissenting). Unfortunately, allegations by employees regarding the display of nooses within the workplace persist. One study regarding racial discrimination and harassment claims noted that "[a]ctual physical objects, such as nooses or [KKK]-associated attire, are left for plaintiffs in their work space (and occasionally at the work site more generally) in 5.8% of the cases." Pat K. Chew and Robert E. Kelley, *Unwrapping Racial Harassment Law*, 27 Berkley J. Emp. & Lab.L. 49, 74 (2006). For the reasons above, we conclude the act of hanging a noose on the mirror of an African American's vehicle is undoubtedly an unwelcome form of harassment based on race.

{¶ 25} The fourth element requires us to determine whether the alleged harassment had the effect or purpose of unreasonably interfering with the employee's work performance or creating an intimidating, hostile, or offensive work environment. Stated another way, we must determine whether the work environment was sufficiently hostile to alter the conditions of employment. *Hinton* at ¶ 36, citing *Chapa* at ¶ 34. Factors a reviewing court shall consider include: "(1) the frequency of the discriminatory conduct, (2)

its severity, (3) whether the conduct is physically threatening or humiliating, or whether it is a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance." (Internal quotation marks deleted and citations omitted.) *Id.*; *see also Harter v. Chillicothe Long-Term Care, Inc.*, 2012-Ohio-2464, ¶ 19 (4th Dist.), quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (" 'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' ").

{¶ 26} When resolving whether the conduct was "severe or pervasive enough" to alter the conditions of employment, a reviewing court "must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of [] abusive treatment." *Hampel v. Food Ingredients Specialties*, 89 Ohio St.3d 169 (2000), paragraph five of the syllabus. The "totality of the circumstances" standard in hostile work environment claims "precludes the kinds of analysis that carves the work environment into distinct harassing incidents to be judged each on its own merits." (Internal quotation marks deleted and citations omitted.) *Tod v. Cincinnati State Technical & Community College*, 2011-Ohio-2743, ¶ 52 (10th Dist.). While we must review the work environment as a whole, the greater severity of the harassing behavior requires a lesser degree of pervasiveness to reach a level that liability attaches. *Hampel* at 181. "There is neither a threshold 'magic number' of harassing incidents that give rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." (Internal quotations marks deleted and citations omitted.) *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 21, fn. 5 (2d Cir. 2012). While the dissent contends that Croley's hostile work environment claim is deficient as "he has not shown a regular pattern of racist conduct sustained over time," *see* dissent at ¶ 123, Croley is not required to demonstrate a particular number of incidents.

{¶ 27} In fact, a single incident may create a hostile work environment. *Reed v. Procter & Gamble Mfg. Co.*, 556 Fed.Appx. 421, 434, fn. 2 (6th Cir. 2014) ("only one or two incidents of race-based harassment may be so severe as to constitute a hostile work environment"). While a single incident must be "extraordinarily severe" to constitute a hostile work environment, *see Williams v. New York City Housing Auth.*, 61 F.4th 55, 69